[No. H031108. Sixth Dist. Dec. 19, 2008.]

MICHAEL SHAW et al., Plaintiffs and Appellants, v.
COUNTY OF SANTA CRUZ et al., Defendants and Respondents.

230

234

**COUNSEL**

The Zumbrun Law Firm, Ronald A. Zumbrun, Timothy V. Kassouni, Angela C. Thompson and Todd M. Ratshin for Plaintiffs and Appellants.

Dana McRae, County Counsel, and Jason M. Heath, Assistant County Counsel, for Defendants and Respondents.

## OPINION

**DUFFY, J.**—Michael Shaw, his wife, Joanne Shaw, and their business, JN and MC Shaw Management Corp., doing business as JM Management Company,[1] appeal from the trial court's adverse judgment after a bifurcated bench trial on liability issues relating to their claims against the County of Santa Cruz and two of its employees for inverse condemnation, negligence, trespass, and nuisance.[2] The judgment also dismissed with prejudice the Shaws' remaining claims that were never tried, some of which concerned asserted civil rights and constitutional violations. All the Shaws' claims related to their undeveloped 74-acre parcel[3] of real property located in La Selva Beach that they call Liberty Garden (the property) as an expression of their belief that "individual liberty and ecological health are inseparable."

The Shaws acquired the undeveloped property in 1985. It had been used for various purposes by previous owners, including cattle grazing. When the Shaws acquired it, the property's vegetation was unmanaged and in places, the terrain was largely covered in weeds, poison oak, and other uncontrolled plantlife. Since 1985, the Shaws have expended much effort and funds to successfully restore the property's native plantlife and seed bank.

In 2000, the Shaws applied to the County for a ministerial "Level 1" permit to connect 400 amperes (amps) of electrical power to the property, principally to power a new well that they had constructed under a separate permit to do so. In 2001, the County, through its planning department, denied the application to set the electrical meter based assertedly on its construction of a local zoning ordinance that precluded issuance of a ministerial permit because the property lacked structures. The policy behind the ordinance was to avoid electricity being used to make unpermitted or illegal structures habitable.

After unsuccessfully taking the matter through an administrative hearing, the Shaws sued the County in 2001. They raised numerous constitutional violations of their property rights, including a temporary taking without just compensation, and violations of their federal substantive and procedural due process rights. In the same action, they petitioned for a writ of mandate

---

[1] For ease of reference, we sometimes collectively refer to these appealing parties as "the Shaws."

[2] The two employees were Glenda Hill, at relevant times a principal planner for the county, and Alvin James, its planning director. We sometimes collectively refer to the three defendants as "the County."

[3] The property is also described in the record as being comprised of 67 acres. This discrepancy is irrelevant to the issues on appeal.

seeking an order directing the County to grant them a ministerial permit to connect power to their well. They also sued in tort, alleging claims of trespass, nuisance, and negligence, based on their allegations that the county had caused the spread of foreign weeds on the property by dumping street sweepings on a dead-end county road located next to it.

In 2004, the trial court rejected the County's basis for denying the Shaws the electrical permit they had sought and granted them relief in mandate. The County then issued the permit and the Shaws connected power to their well, which had been powered in the interim by a generator.

The balance of the Shaws' claims were set for trial some two years later, just before expiration of the mandatory five-year statute within which cases must be tried under Code of Civil Procedure section 583.310.[4] At trial, the court granted the County's motion in limine to bifurcate the issue of liability in inverse condemnation—the Shaws' state takings claim. After the bifurcated bench trial had begun and upon the stipulation of the parties, the court also concurrently tried liability issues in connection with the Shaws' three common law tort claims.

After trial, the court issued what it called a "MEMORANDUM OF DECISION" in the County's favor on the bifurcated issues. No one requested a statement of decision. The memorandum decision requested the County to prepare a form of judgment. The County complied with this directive, submitting to the Shaws' counsel a proposed judgment that incorporated factual findings from the memorandum decision, gave judgment to the County, and dismissed the Shaws' entire complaint, including the claims that remained to be tried, with prejudice. The Shaws' counsel did not sign the form of judgment for his approval as to its form but neither did he indicate any objection to it when given the opportunity. Nor did the Shaws request that the constitutional and other claims remaining, as to which they had up to that point preserved a right to a jury trial, be tried rather than dismissed. The court was later apprised that the Shaws' counsel had no objection to the form of the judgment, which the court then signed and entered. The Shaws did not thereafter bring to the court's attention that they wished a trial on any of their remaining claims. Nor did they make any posttrial motions, including any request that the court vacate the dismissal of their constitutional-violation claims that were never tried or dispositively ruled on by the court, instead only having been dismissed with prejudice by entry of the judgment.

The Shaws now appeal from the judgment, challenging the court's disposition of their claims for inverse condemnation, nuisance, and trespass. They

---

[4] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

also contend that the court erred by excluding evidence during the course of the bifurcated trial. They further claim that the court erroneously disposed of their federal claims for violation of civil rights and due process on the basis that the claims were not ripe.

We find no error arising from the bifurcated trial and conclude that the judgment in favor of the County on the tried claims is legally correct and supported by substantial evidence. We also conclude that the court made no dispositive ruling on the merits with respect to the Shaws' civil rights and related due-process-violation claims and further that the Shaws acquiesced in the court's ultimate dismissal of these claims with prejudice by failing to request that these claims be tried after the bifurcated portion of the trial had concluded or otherwise objecting to the dismissal of the claims in the judgment or seeking to vacate that dismissal below. They have consequently forfeited asserted errors with respect to these claims on appeal. We accordingly affirm the judgment.

## STATEMENT OF THE CASE

### I.  *Factual Background*[5]

#### A.  *The Property*

The Shaws acquired the property in 1985. At that time, portions of it were inaccessible as they were filled with poison oak, stands of old oak trees, and unmanaged nonnative vegetation. Although they have never submitted a residential-development application, the Shaws' ultimate goal for the property is to "create [a] landscape that can be supported by citizens who would occupy" the property "so that it can be continually improved and maintained" in perpetuity by "the consolidated effort of a community that would take up residence on the landscape."

The County contends that the property is located in the coastal zone.[6] It further contends that the property is designated rural residential (R-R) in the general plan and is zoned both residential agricultural (R-A) and agricultural

---

[5] We take the facts from the evidence submitted in connection with the 2004 writ of mandate proceeding and the 2006 court trial.

[6] Property located within the coastal zone is under the jurisdiction of the California Coastal Commission and is subject to the provisions of the California Coastal Act of 1976 in addition to the local coastal plan that coastal governments are required to create to reflect the policies of the Act. (Pub. Resources Code, §§ 30000 et seq., 30121, 30500, 30512, 30512.2; *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1287 [38 Cal.Rptr.3d 316].) The broad policies of the coastal act are to protect the coastline and its resources and to maximize public access. (*Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215, 242 [77 Cal.Rptr.3d 432].)

(A) under the local zoning ordinance. The Shaws, for their part, contend that the property is zoned only for rural residential use and that any other zoning designation is inconsistent with the general plan. But they have never formally challenged the County's zoning designations of the property. The Shaws acknowledge that they have never engaged in any agricultural use of the property.

The Shaws live in La Selva Beach, approximately one mile from the property. In addition to their native-plant restoration efforts as described below, the Shaws use the property to grow some edible plants and herbs that they consume and they also have transplanted some native plantlife from the property to their home garden.

### B. *1985 Minor Land Division Application*

In November 1985, while their purchase of the property was still in escrow, the Shaws applied for a minor land division to subdivide the property into four parcels. They planned to build their home on one of the subdivided parcels. The County denied their subdivision application without prejudice in writing in February 1988 for the asserted reason that the Shaws had failed to submit sufficient information to fully process the application, including a required geological report[7] and the identification of four building sites suitable for septic tank installation. The written denial also referenced the County's various designations affecting the property, including the "scenic corridor requirements, road access requirements, riparian corridor determinations, density calculations, agricultural buffer requirements, septic requirements and building envelope restrictions." The Shaws did not appeal or otherwise challenge the 1988 denial based on their perception of unfavorable political and economic factors.

### C. *The Shaws' Restoration Efforts*

Shortly after acquiring the property in 1985, Michael Shaw and hired crews began the long-term, arduous, and expensive process of managing its vegetation and hydrology, eradicating weeds and poison oak, and successfully restoring the property's native plantlife and seed bank, mostly by hand. They also constructed road improvements, for which the County issued them a permit to install a culvert.

Over the course of time, the Shaws' extensive work succeeded in removing both "exotic" (i.e., nonnative) plants and weeds and "aggressive native

---

[7] At trial, almost 20 years later, the Shaws asserted that they had submitted the requested geological report and that discovery in the course of this litigation had shown that the report they had submitted was actually in the County's files.

species" from the property that if left alone, "would become monocultures." In addition to the road improvements, they made other drainage improvements to increase waterflow in a creek running on the property and to address other "hydrologic problems" that had promoted water runoff and had decreased the property's water absorption. These changes resulted in a much improved water table able to nourish the native plant growth. The Shaws' efforts led to the "releas[e of] the [existing] native local seedbank," results that, even by 1996, had been described as "dramatic." By 2002, Michael Shaw characterized in a journal article their success in the management and restoration of native plantlife on the property as "immediately obvious."[8] The article also stated that Shaw "eventually plan[ned to] develop the property as a nature retreat where people from around the world can experience the potential of wild California ecosystems or as a prototype wildlands/housing community." As acknowledged by Michael Shaw, the County at no time interfered with the Shaws' efforts to clear the property of weeds and nonnative plants as part of their restoration efforts. Nor do the Shaws claim that the County interfered with their native-plant restoration efforts, other than their specifically pleaded claims that the County's denial of the electrical permit to power the well and its placement of street sweepings next to the property had this effect.

### D. The Street Sweepings

In or around 1992, the Shaws began to engage with the county over the county's practice of temporarily dumping street sweepings on a dead-end county road abutting the property pending transport of the sweepings to the dump. The Shaws contended that the dumped material contained foreign grasses and weeds that would migrate onto the property, primarily via a culvert, where the Shaws were attempting to eradicate such growth as part of their restoration efforts. Michael Shaw engaged in correspondence with the county in which he repeatedly requested the county cease its dumping practice and the county outlined its reasons for choosing this location (cost and efficiency) and its efforts, such as installation of a filter trap in the culvert, to prevent migration of matter contained in the sweepings onto the property. The Shaws contended these efforts were unsuccessful. In its correspondence, the county also noted other ways that undesirable vegetation could migrate onto the property, such as from vehicles loaded with debris driving to the nearby landfill on Highway 1.[9] The county continued this dumping practice for some period of time but stopped in 2003.

---

[8] The article was published in June 2002 in Ecological Restoration (vol. 20, No. 2). It was co-authored by Michael Shaw and entitled *Releasing the Native Seedbank—An Innovative Approach to Restoring a Coastal California Ecosystem*. This article was before the court in both the mandate proceedings and at the bifurcated trial.

[9] Michael Shaw also conceded at trial that undesirable grasses were on the property when the Shaws acquired it and that there were numerous ways that unwanted grasses could migrate

E. *The Well*

In 1995, the Shaws applied for a permit to drill a well on the property. The permit was approved by the county's environmental health services agency in February 1996 and it called for a final site inspection in December 1999. In 1997 or 1998, the Shaws proceeded to construct and drill the large—approximately 12 feet in diameter—well under the permit at a cost of approximately $100,000. The well permit was "signed off" by the county in 1999.

That same year, the Shaws contracted with PG&E (Pacific Gas and Electric Company) to bring electrical service to the property, initially to power the well. But the Shaws wanted enough amperage to service not only the well but the property's entire 74 acres. They requested PG&E "bring enough [power] to satisfy the region" so as to avoid having to "dig up the road twice" to accommodate their later, unspecified power needs. In this regard, Michael Shaw did not request a particular level of amperage but told PG&E to "imagine 75 acres put to an economic use by somebody some day. . . . [L]ook at the surrounding neighborhood and the density of development and satisfy any potential need for electricity so we don't have to dig the road twice." Although he did not refer to any specific development plans, he relayed to PG&E that "the property was zoned for up to 30 houses and that clearly it's a piece of property that the public would enjoy using, whether it be for housing or for retreat use . . . ." At a cost of approximately $50,000 to the Shaws, PG&E provided the infrastructure and facilities to service the property with 400 amps of electrical power, a level of amperage that PG&E determined based apparently on what Michael Shaw had indicated concerning possible future uses of the property.

On October 23, 2000, the Shaws applied to the county planning department for a ministerial Level I permit to connect electrical power to the property in order to power the well. Their application said that they sought to "[i]nstall a pump and 400 amp electrical service for a well. To be used for irrigation [and] to restore native plants. No structures on site." The Shaws, through Michelle Michael, their representative who personally submitted the permit application at the planning department counter, also orally informed that agency that the purpose of the well was "irrigation" and "fire protection." The county employee who received the application informed Michelle Michael that the department could not "approve a permit [over the counter] because

---

onto the property via water, wildlife, and people. He also conceded that weeds on the property will never be entirely eradicated because they are part of the living seed bank and that he could not "quantify or confirm the existence" nor could he "prove the effect of any of the weed seeds that were dumped for so many years" on the county road next to the property.

there was [no] dwelling, it was for landscaping" and that the department would need a copy of the well permit to go to the next step.[10]

Michelle Michael then obtained a copy of that permit from the county's environmental health department, which had issued it.[11] On her second visit to that department, on November 18, 2000, Michelle Michael met with a county employee there who "was very friendly and signed off the application without any questions, but [who] did state that zoning may still make [the Shaws] jump through some hoops." Michelle Michael then went "to zoning," where an employee said that the Shaws "could not have power to the parcel without a single-family dwelling" on it. The employee also said that "sometimes Environmental Health issues permits without consulting the [planning or zoning] department." The employee suggested to Michelle Michael that she talk to Glenda Hill, the "head of the department."[12] Michelle Michael left a note for Hill and, not having heard from her in the next several weeks, she began to leave telephone messages asking Hill to return the calls. When the calls were not returned, Michelle Michael turned the matter over to her husband, Dave Michael,[13] for followup.

Dave Michael began calling Hill around December 2000 and he left four to six messages but received no return phone calls.[14] Because of this lack of response, Dave Michael personally went to meet with Hill, whom he had previously known to be extremely helpful, in an attempt to understand why the Shaws were being denied a permit to set the electrical meter, through which they could power the well. At the meeting, Hill reviewed the county ordinances that she thought were applicable to preclude the issuance of a

---

[10] The County also noted on the application that based on expressed "domestic usage," the application was exempt from the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) but also that the 12-foot size of the well and the 400 amperage service capacity suggested agricultural irrigation purposes, which would not be exempt.

[11] The county's environmental health department issues permits for the drilling of a well but the county's planning department regulates the connection of any electricity required to power a well or anything else.

[12] At the time, Hill was a principal planner, which is a manager assigned to one of the sections of the planning department. Hill was then assigned to zoning services, where she managed four employees.

[13] Dave Michael is a general contractor whose company worked with the Shaws regarding the well. His wife, Michelle, worked with him and they together interacted with the County over the Shaws' application for a permit to connect electricity to the property to power the well.

[14] Hill testified that at the time, she was new to her position and severely understaffed. She had difficulty returning phone calls and she received about 30 per day. She always had a few hundred phone calls to return during that time period and she returned them as promptly as she could. She acknowledged that due to understaffing, she "was not providing good public service" in regard to returning phone calls and at the time, she informed her supervisor of this fact repeatedly.

Level I[15] ministerial permit to connect electrical power to the property. She repeatedly asked for more information about the purposes of the application, what was going on with the property, and what exactly was being proposed. Dave Michael told her that "it was none of [her] business."[16] Hill told Dave Michael that under local ordinances and without a residence on the property, the Shaws would not be able to get a ministerial Level I permit to set the electrical meter but that they could apply for a "Level V" permit, which required a public hearing and the exercise of discretion by an approving body. She explained the rationale and policy behind the ordinances, which was the County's historical concern that providing electrical service to vacant land in some cases had led to the construction of illegal dwelling units and the use of power designated for a well to provide electrical service and water to the illegal units. She also described the procedure through which the Shaws could request an administrative hearing if they chose to pursue the Level I permit application further. And she informed Dave Michael that the Shaws could use a generator to power the well without the need for County approval. After reviewing the ordinances cited by Hill, Dave Michael expressed to her his belief that they did not apply to the Shaws' situation.

Hill had previously reviewed and denied many applications for electrical hookups for wells on vacant residentially zoned land for the same reasons. And she had considered the Shaws' application unusual from the start in that it had requested electrical service of 400 amps, whereas the typical amperage for a well hookup is 60 amps. She had never seen a request for such a large amperage for a well and she questioned the need for that level of power on an apparently vacant piece of property, leading to her inquiries about what was being proposed. In this vein, she did not "completely understand the purpose for the application," which she reviewed in combination with the county's residential use chart "to see[,] as best [she] understood the application[,] whether there was a use listed in the Use Chart that would allow [her] to approve" it.[17] She was not able to find a use in the chart that she thought would allow her to issue the Level I permit based on the information that she had and her understanding about the proposed use.

[15] There are seven levels of permit processing in Santa Cruz County, which proceed in ascending order, Level I being the least onerous to the applicant. The first three levels are ministerial and the last four are discretionary. (Santa Cruz County Code, § 18.10.112.)

[16] At trial, Dave Michael denied having said these exact words to Hill. He also testified that they discussed the Shaws' intended use of the property and that the well was needed for "[i]rrigation, fire protection, and gardening." Still, it was not until she heard the testimony at trial that Hill understood the asserted "justification" for the amperage the Shaws had requested—the broad scope of the property's native plant and seed bank restoration and the Shaws' ultimate vision for Liberty Garden.

[17] The zoning "use charts" are contained in the Santa Cruz County Code. They "list[] the different uses that are allowed and not allowed in each zone district." (See, e.g., Santa Cruz County Code, § 13.10.322, subd. (b) [concerning residential uses].)

Some months later, in May 2001, Hill received a telephone call inquiring as to the status of the Shaws' application. She was embarrassed to discover that although she had earlier made notes in her computer about the denial of the application, she had never formally notified the Shaws of this decision. On May 17, 2001, the planning department, through Hill, formally denied the application in writing for the given reason that based on Santa Cruz County Code section 13.10.611, subdivision (c)2,[18] a Level I permit was not the proper permit level for an electrical hookup on vacant property lacking a main structure or an agricultural use and that without any structures on the property, or an agricultural use, the Shaws would need to apply for a Level V permit. The denial also noted that no justification for 400 amps service had been submitted and that the Shaws could revise the proposal, apply for a Level V permit, or appeal the adverse determination.

Hill made her decision to deny the permit by relying on three factors: (1) her concern about the requested amperage and the need for it based on the asserted use of the vacant property; (2) that the request was not in conformance with an internal department policy memo on the approval of ministerial Level I electrical permits for wells;[19] and (3) Santa Cruz County Code section 13.10.611, subdivision (c)2. In other words, there was one undisclosed reason—the policy memo—in addition to the two stated reasons in the written denial. But Hill did not make her decision for purposes of delaying the Shaws' goals for the property, or for any reason related to the Shaws or their land management practices.

The planning director, defendant Alvin James, sustained Hill's decision following an administrative hearing, which the Shaws had requested and videotaped, on the basis of Santa Cruz County Code section 13.10.611, subdivision (c)2. Dave Michael and Hill were present at the hearing but not

---

[18] Santa Cruz County Code section 13.10.611 concerns "Accessory Structures." The pertinent subdivision, which concerns "Restriction on Accessory Structures," states: "No habitable and no non-habitable accessory structure shall have an electrical meter separately from the main dwelling, and no accessory structure may have electricity in the absence of a main dwelling, except as may be approved pursuant to the use charts for the zone district or a Level V use approval." (Santa Cruz County Code, § 13.10.611, subd. (c)2.)

[19] Hill received this policy memo dated August 18, 1983, and understood it to be a public document, although a member of the public would not have known about the memo unless told about it by planning staff, who were instructed to inform the public about information in policies as well as local ordinances. The memo said, "Effectively [sic] immediately, staff will implement the following: [¶] 1. Power for wells on Agricultural land may be approved where no house exists only if there is a legitimate agricultural use . . . . [¶] 2. Power for wells on Residential land where no house exists may not be approved. [¶] 3. Power for non-habitable structures where no house exists may not be approved." The memo applied only to the issuance of ministerial electrical permits. Hill never provided Dave Michael or the Shaws with a copy of the memo, which was rescinded and replaced in June 2004 to allow ministerial approval of electrical service of up to 60 amps to vacant property with particular zoning designations for things such as wells, fire prevention, and gates.

the Shaws themselves. Dave Michael was given a full opportunity to advocate the Shaws' position. But he thought the County had treated the Shaws' application differently from the 16 to 20 other Santa Cruz County permit applications he had previously been involved with. Still, none of those other applications had dealt precisely with the question of an applicant's right to a Level I permit to power a well on property lacking a main or accessory structure.

After the permit denial, the Shaws purchased and used generators as a source of power on the property, successfully powering the well and continuing their native-plant restoration efforts.[20]

### F.  Other Development Issues

In 2003, the Shaws hired an architect to design what they called an "activity center" for the property, which was intended to be a common area for the residential community that they ultimately planned to develop. At Michael Shaw's request, the architect communicated with the county planning department about the feasibility of the plans for the activity center and about what requirements and conditions would be imposed in order to build them out. But the Shaws never formally sought the County's approval of the plans or submitted an application for a permit to build the center.

In February 2005, during the pendency of this lawsuit, the Shaws wrote a letter to the County inquiring about a permit to construct a maintenance shed on the property. They did not submit a formal application. The County responded to the letter, asserting that the dimensions of the proposed shed exceeded what was allowed by zoning regulations; that under zoning regulations, electrical power could be connected to a maintenance structure located on the portion of the property zoned agricultural if there was a demonstrated agricultural use on the site and the shed served the agricultural use; or, alternatively, the Shaws could apply for a Level V use permit, which would require a public hearing. The Shaws responded by disputing the County's conclusions but they still never formally applied for a permit to build the shed.

### II.  Procedural Background

### A.  The Pleadings

The Shaws filed their complaint on September 12, 2001. The charging factual allegations were limited to a general claim of governmental interference with the "development" of the property; a claim that since 1997, county

---

[20] At the time of trial, they still used the generator as an additional source of power on the property.

agents had routinely dumped street-cleaning debris adjacent to the property causing the introduction of "foreign seed" and "resulting in the proliferation of [B]ermuda grass and other undesirable weeds" on the property; and a claim that the County would not permit the Shaws to connect electrical power to their well that had already been approved by the county's environmental health department "thus preventing watering and fire protection." The complaint included causes of action labeled trespass, negligence, injunctive relief, taxpayer relief, inverse condemnation, "constitutional rights—civil rights," declaratory relief, and mandamus. The federal constitutional rights alleged to have been violated and through which the Shaws sought relief under 42 United States Code section 1983 were abridgement of their rights under the First (free speech and expression), Fifth (takings), and Fourteenth (due process and equal protection) Amendments.

In January 2002, the Shaws represented in a case management statement that "it [was] too early in the development of this case to provide an estimated court time to dispose of [it]. Defendants have recently made their first appearances and discovery is just beginning." This statement was repeated in another of the Shaws' case management statements filed in May 2002 and in yet another filed August 15, 2002, nearly a year after the complaint was filed.

On August 26, 2002, the Shaws filed a separate action alleging the same claims against the same defendants for trespass and negligence arising out of the same facts as had been pleaded in the first action. But this time, the pleading added a cause of action for nuisance and the required allegations concerning the presentation and denial of a claim under the Government Claims Act. (Gov. Code, § 810 et seq.)

In a case management statement filed in the first action on November 22, 2002, the Shaws represented again that that case was not yet ready for trial as, "[d]iscovery is not complete and the Administrative Record has not been prepared."

On December 4, 2002, by stipulated order, the two actions were consolidated for all purposes.

In case management statements filed February 14, 2003; May 23, 2003; and August 14, 2003, in the consolidated actions, the Shaws repeated the same statements about the case not being ready for trial because discovery and the administrative record were not yet completed. At a case management conference held on August 29, 2003, the court set the Shaws' petition for writ of mandamus for hearing for January 23, 2004, nearly two and a half years after the action was filed.

B. *The Proceeding in Mandamus*

The Shaws' writ petition concerned the County's 2001 denial of their application to connect power to their well "to provide water to their native plants, as well as fire protection." It specifically challenged the planning department's conclusion that the local zoning regulation relating to residential property with a main structure (Santa Cruz County Code, § 13.10.611, subd. (c)2) applied to prohibit the power connection to the Shaws' property, distinguishing the property on the basis that it lacked structures and was therefore beyond the section's reach. They also contended that their use of the property for a family gardening purpose brought them within an exemption to the zoning regulation relied on by the County to preclude issuance of the Level I permit. The Shaws sought an order directing the County to perform the ministerial duty of issuing the Level I permit without a public hearing and a determination that the County had abused its discretion in denying the permit in the first place, thus failing to proceed in a manner required by law.

Documents before the court included a declaration of Michael Shaw in which he represented that the property was a "highly successful ecological habitat restoration and native plants management program."

The County opposed the issuance of the writ and maintained that under Santa Cruz County Code section 13.10.611, subdivision (c)2, it could not have issued a ministerial Level I permit for the installation of electrical service on residentially zoned property on which no main structures had been built; that the Shaws could have proceeded with an application for a Level V permit, which would have required a public hearing, among other things; and that their failure to have done so constituted a failure to exhaust their administrative remedies. The County also contended that the Shaws' use of the property constituted restoration and not family gardening.[21] The matter came on for hearing on March 4, 2004.[22] The court concluded that the

---

[21] "Gardening, Family" is defined in the Santa Cruz County Code as "The non-commercial raising for family use of vegetables, berries, trees, fruits, vines, grapes, flowers, ornamental trees or shrubs." (Santa Cruz County Code, § 13.10.700-G.) Family gardening is designated as a permitted residential use in the zoning use chart found in Santa Cruz County Code section 13.10.322, subdivision (b) such that no approval was necessary for this allowed use.

[22] At the later trial in 2006, the court inquired why it had taken nearly three years ("an inordinate period") for the mandamus petition to be heard. The court's concern was related to the question of who bore the responsibility for that delay in the event the court were to find a temporary taking as a result of the County's initial denial of the use permit. Counsel for the County said in response that the delay was due to the parties being engaged in "extensive discovery." But our review of the record, as indicated in the Shaws' case management statements and the court's order setting the 2004 hearing in mandate, also indicates no affirmative conduct by the Shaws to do anything to set the mandate hearing earlier. And, by

County had misapplied Santa Cruz County Code section 13.10.611, subdivision (c)2 to disallow the issuance of a Level I discretionary permit. The court agreed with the Shaws, construing this section to be inapplicable to vacant properties, i.e., those lacking in either a main or accessory structure. The court further concluded that the Shaws' use of the property for family gardening exempted it from the section's reach as this was an allowed residential use according to the County's residential use chart, an additional basis for issuance of the ministerial permit. The court's written order, filed April 14, 2004, concluded that "once the well permit was issued and approved and electrical power provided, [the County] had a ministerial duty to authorize the setting of the electrical meter." The order granted the Shaws' petition and directed the issuance of a writ of mandate "commanding the County of Santa Cruz to issue a Level I Use Permit to [the Shaws] for an electrical meter connection to be established between the previously permitted well and PG&E services."[23] The writ issued on May 19, 2004, and on June 7, 2004, the County served its return, accompanied by a use permit issued to the Shaws. After the Shaws objected to the language of the permit, on July 2, 2004, the County amended its return and issued a revised use permit, for which the Shaws paid fees on August 30, 2004. Electrical power was connected in January 2005.

## C. *Later Proceedings Leading to the Bifurcated Trial*

On June 26, 2006, which was some two years after the granting of the writ and some two and a half months before the expiration of the five-year statute under section 583.310, the Shaws filed a request for an immediate case management conference to set a trial date for the remaining causes of action

---

their own admission, they were not ready to proceed earlier due in part to their perpetually stated need to conduct discovery.

[23] The Shaws repeatedly assert that under the law-of-the-case doctrine, the trial court's ruling in mandate establishes legal precedent that is somehow forever binding in the life of this case. They are mistaken. Specifically, they attempt to establish, using the law-of-the-case doctrine, that because the County's positions regarding the electrical permit denial were determined to be erroneous, they were also inherently unreasonable and arbitrary. But "[u]nder the doctrine of the law of the case, a principle or rule that *a reviewing court* states in an opinion and that is necessary to the reviewing court's decision must be applied throughout all later proceedings in the same case, both in the trial court and on a later appeal. [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 94 [41 Cal.Rptr.3d 319, 131 P.3d 400], italics added.) "Absent an applicable exception, the doctrine 'requir[es] both trial and appellate courts to follow the rules laid down *upon a former appeal* whether such rules are right or wrong. [Citation.]' As its name suggests, the doctrine applies only to an *appellate court's* decision on a question of law; it does not apply to questions of fact. [Citation.]" (*People v. Barragan* (2004) 32 Cal.4th 236, 246 [9 Cal.Rptr.3d 76, 83 P.3d 480], italics added.) Nor does the doctrine apply to rulings of the trial court. (*People v. Sons* (2008) 164 Cal.App.4th 90, 100 [78 Cal.Rptr.3d 679]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 460, p. 517.) It thus does not apply to the trial court's ruling in mandamus here and the ruling, though final, establishes no legal precedent that must be followed in this case in the determination of other issues.

of their complaint. On June 29, 2006, they filed a case management conference statement—their first to indicate that the action was actually ready for trial. The statement said that trial "needs to be set prior to September 11, 2006 to avoid the five year statute." The court set a jury trial date of August 28, 2006.

On August 11, 2006, the Shaws filed a motion seeking to file a supplemental complaint based on factual matters they had assertedly become aware of only after the litigation was ongoing. The proposed pleading added no new causes of action but added new factual allegations to the existing claims regarding the County's alleged continued interference with "the development of" the property occurring since the filing of the complaint. The new allegations included that the County had failed to make applicable zoning of the property consistent with the general plan; had improperly designated a scenic corridor affecting the property; had unlawfully designated the property as being within the jurisdiction of the coastal commission; had imposed an agricultural buffer requirement on the property, which was not even suitable for agriculture; and had improperly imposed a deed restriction requirement in connection with the Shaws' proposal to build a shed (that the structure would be maintained as nonhabitable).

The County opposed the motion, contending that the new factual claims were either barred by the statute of limitations relating to the County's 1988 denial of the subdivision application or not ripe, the Shaws not having submitted a development application subjecting those claims to the administrative process; that the facts were irrelevant as they did not relate to the pleaded matters (the electrical permit denial and the dumping of street cleanings on adjacent property); and that the County would be prejudiced by the late allegations. The Shaws countered that under *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006 [73 Cal.Rptr.2d 841, 953 P.2d 1188] (*Landgate*), the new facts were relevant to the issue whether the County had acted reasonably in denying the electrical permit application or whether its conduct was so unreasonable as to lead to the conclusion that the denial was for no purpose other than delay, which would not advance any valid government objective and would amount to a temporary taking.

The court denied the motion, concluding that injection of the late allegations on the eve of trial would be prejudicial to defendants and that trial could not be continued to mitigate the prejudice due to the imminence of the five-year statute.

### D. *Proceedings at Trial*

In their trial brief, the Shaws reiterated, among other things, their right to a jury trial of their federal civil rights and constitutional claims.

Defendants brought several motions in limine, including, as relevant here, one to "bifurcate and narrow takings claims." The motion sought to bifurcate for trial the state-law issue of the County's liability in inverse condemnation and to have the court decide this question. It also sought to narrow this claim to those factual matters pleaded in the complaint—the denial of the use permit to set the electrical meter and the claim that the county's dumping of street cleanings next to the property caused foreign weeds to proliferate on it. This narrowing sought to eliminate from contention the additional factual matters that the Shaws had attempted to plead by supplemental complaint— "overlay" zoning designations relating to consistency with the general plan, a scenic corridor, inclusion in the coastal zone, agricultural buffers, and a deed restriction—based again on the fact that the claims were either time-barred or not ripe. The motion also sought to dismiss the Shaws' federal takings claim as unripe, the Shaws not yet having exhausted their administrative remedies by obtaining a final adjudication of their state takings claim.

Another of the defendants' motions in limine was to "exclude evidence of County denial of 1988 minor land division application" on the basis that the statute of limitations on any claim relating to the denial had long since passed and the Shaws had failed to exhaust administrative remedies on any such claim by timely challenging the denial of the application by any means.

With respect to the County's motion to bifurcate and narrow the Shaws' takings claims for trial, the Shaws responded that the motion should be denied as untimely. They also acknowledged that as to evidence "regarding zoning and land use designations applicable to [their] property," they did not seek to introduce such evidence to recover damages for these designations, which they conceded were time-barred for purposes of recovery, but instead to show the context of County's "pattern of discrimination" and "motive" as relevant to their takings claim concerning the County's initial denial of the permit to set the electrical meter on the property.[24] The Shaws reiterated their right to a jury trial of their constitutional due process claims and argued that bifurcation of the issue of the County's liability in inverse condemnation would result in inefficiency and a waste of judicial resources and would further provide for the possibility of inconsistent results as the jury would still later be hearing and deciding their related due process violation claims on much of the same evidence.

---

[24] In assessing the constitutionality of events occurring within the limitations period for federal claims, prelimitations events are relevant as evidence of an unconstitutional motive. (*RK Ventures, Inc. v. City of Seattle* (9th Cir. 2002) 307 F.3d 1045, 1062; *Anderson v. Reno* (9th Cir. 1999) 190 F.3d 930, 936 [Even if not actionable in and of themselves, untimely claims may serve as relevant background evidence to put timely claims in context.], overruled on another ground in *National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101, 113 [153 L.Ed.2d 106, 122 S.Ct. 2061] [rejecting continuing violation doctrine for discrete acts in employment discrimination context].)

With respect to the County's motion to exclude evidence of its 1988 denial of the Shaws' minor land division application, the Shaws again asserted that they did not seek to introduce such evidence for purposes of damages or recovery but only to "show [the County's] motive and to put [the Shaws'] remaining [civil rights] claims into context" by demonstrating a "pattern of discrimination against them and their development projects on the subject site since the 1980s." The Shaws also argued that the evidence was admissible to show that the individual defendants were not immune from liability as they should have known that "the conduct complained of violated statutory or constitutional rights."

The court denied the County's motion to exclude evidence of the 1988 denial of the Shaws' minor land division application, ruling that there could "be evidence that the application was submitted" and that it "was denied." But the court also ruled that "[t]here is not going to be any evidence of any kind[,] including opinion testimony[,] as to the reasonableness or propriety of that application or denial. It's simply to provide context for the other claims." The court later clarified its ruling, stating, "The fact that the application was filed, the substance of the application, obviously, assuming the application, itself, or some summary documents would come into evidence and the fact that the county denied the application, but we're not going to have anybody testifying as to whether this was a good application, a bad application, whether the county's position was reasonable or unreasonable. It was not challenged and it's just part of the history of this property with these owners. That's it. It's a very sterile bit of evidence, if you will."

The Shaws later made an offer of proof in response to the court's ruling, which they understood to preclude evidence of the County's motive in denying the minor land division application. The offer of proof, which was directed to the due process claims and not the inverse condemnation claim, was as follows: "The substantive due process goes to the motivation of the public agency when dealing with the particular opponent. In the 1980s the [Shaws] sought a permit and they had a series of actions by the county which were [for example] you have to get a geology—a supplemental geology report in. It [was] submitted. [The County] then ruled you didn't get the supplemental geology report in. [The Shaws] said[, 'W]e did. Here it is.['] The County said, ']We don't have it in our file.['] In discovery this year, 20 years later, that shows up in the county file. That's one example of mistreatment. [¶] Other examples of mistreatment back then are not properly explaining what the various objections that are being made to the permit application and leav[ing] the property owner without knowledge of what was before the property owner and there's things of this type that go on and on that I'm talking about and the Court may be talking about that, but I wanted to make that offer of proof."

The court responded by confirming that the kind of evidence referred to by Shaws' counsel was subject to its in limine ruling. But the court qualified its ruling by saying, "[I]t sounds like, however, that through some of [the] witnesses that are going to be here that some of that material may be used to impeach somebody but it's not going to be introduced for the purpose of demonstrating the reasonableness of the county's position or, indeed, to make any judgment as to what [the Shaws] were doing and why they didn't appeal or . . . petition for writ of mandate, just the history, in other words, we have this history, but not who did what to whom in the process except to the extent if you want to suggest that somebody lied to [the Shaws] at some time, it may be something that you want to impeach somebody with. But I am ruling on that at this point."

The Shaws' counsel then "expand[ed]" their offer of proof by adding, "After the permit was denied [in 1988, the Shaws] pursued their options with the board of supervisors. They were told by their district supervisor that she would only go for one house and with the deed restriction deeding the rest of the property not to be built upon. With that they realized they were in serious trouble and . . . they didn't have the funds." The court responded by stating, "I'm excluding that. It's simply aged out."

With respect to the County's motion to bifurcate and narrow liability issues relating to the Shaws' inverse condemnation claim, the court initially expressed reservations, observing that the motion should have been brought earlier and that, in the court's view, it was not a true evidentiary, in limine motion. The County argued that the Shaws had asserted the new factual allegations only just before trial, precluding the possibility of an earlier motion, and that the court's previous denial (by a different judge) of the Shaws' motion to file a supplemental complaint had effectively disposed of this issue in any event. The court observed that to the extent the motion sought to dispose of the federal takings claim for the Shaws' failure to have exhausted administrative remedies at the state level, it should have been brought pretrial as a motion for summary adjudication. But the court also noted that the County's legal position with regard to the claim appeared to be correct. The Shaws conceded this point with respect to the federal takings claim but argued that there was no requirement to exhaust state remedies with respect to their federal due process violation claims, as to which they had a right to a jury trial.[25] The court disagreed, viewing the federal takings claim and the due process claims as both requiring an exhaustion of state remedies.

The Shaws continued to argue that because they had a right to a jury trial with respect to their due process violation claims, bifurcating liability issues

[25] The Shaws' due process claims, which were legally distinct from their takings claims, were not the target of the motion in limine in any respect.

on the state inverse condemnation claim would be inefficient because it would require them to elicit the same factual evidence twice—once before the court when trying liability in inverse condemnation and later before the jury when trying the due process violation claims. The court noted that all these claims were factually intertwined and could not be segregated and would have to be tried by the same tribunal. The Shaws agreed, apparently in the belief that this would lead to denial of the motion to bifurcate. But the court then repeated its view that, except as to the issues of the County's denial of the electrical permit for the well and its dumping of street cleanings, the federal claims, without distinction between takings and due process, were "not ripe." The court continued, "I'm not trying to take away the right to a jury trial or, indeed, a right to proceed with that cause of action. It seems to be premature is the issue. I'm not . . . ruling against you to dismiss the case with prejudice or something. The question is whether it is ripe." The court understood that the Shaws had exhausted administrative remedies with respect to the electrical permit denial but still expressed its view that a final determination in state court on this claim too would be required before any federal claims, without distinction between takings and due process, would be ripe for adjudication.

The court concluded discussion of the in limine motion by stating what it described as its "tentative ruling." The court said, "It's my tentative intention and I don't know exactly how to do this. It's almost like [abating[26]] a cause of action, the federal taking and the federal due process. It's not ripe. That doesn't mean the statutes run against you or the five-year statute is running against you. It, basically didn't need to be filed yet and, correctly, can't have been filed yet as it relates to those causes of action. That would leave us with, obviously, the state taking cause of action. . . . [¶] . . . [¶] . . . [I]t would be my tentative intention, then, to, in fact, bifurcate to determine whether there has been a state taking inverse condemnation prior to asking a jury to determine the amount of compensation that would be appropriate."

---

[26] " 'A plea in abatement is essentially a request—not that an action be terminated—but that it be continued until such time as there has been a disposition of the first action.' [Citation.]" (*Lawyers Title Ins. Corp. v. Superior Court* (1984) 151 Cal.App.3d 455, 459 [199 Cal.Rptr. 1].) Where a plea of abatement on the ground of another action pending is raised by demurrer or answer, a court may proceed to hear the special defense and where it is sustained, "an interlocutory judgment shall be entered in favor of the defendant pleading the same to the effect that no trial of other issues shall be had until the final determination of that other action . . . ." (§ 597.) A determination of a plea in abatement asserted in response to a complaint is not considered a decision on the merits of the complaint. (*Ibid.*)

The court's tentative ruling thus did not dispose of the Shaws' federal due process violation claims on the merits,[27] instead only deferring them, and the court firmly stated that the ruling did not effect a dismissal with prejudice of these claims, which, again, had not even been the target of the County's in limine motion.

After the ruling, the Shaws returned to the topic of their asserted "mistreat[ment]" by the County since the filing of the complaint. They reiterated those facts that they had included in their proposed but disallowed supplemental complaint—the scenic corridor, coastal zone, and agricultural buffer designations—in an effort to clarify that they were "able to use that stream of unreasonableness to put this action in proper perspective." The court responded that it had made no orders relative to that evidence.

The bifurcated trial before the court concerning the County's liability in inverse condemnation then proceeded, with the court and the Shaws both indicating an anticipation of a second phase of trial before a jury. But shortly into the taking of testimony, the Shaws agreed that while hearing and determining the liability question in inverse condemnation, the court—instead of a later jury—could also hear and determine the liability issues relating to the common law torts of negligence, trespass, and nuisance.[28]

During the course of trial, the court heard some of the evidence proffered by the Shaws about their interactions over time with the County, i.e., how they were treated and the asserted unreasonableness of that treatment, relating to the denial of the permit to set the electrical meter and other matters. These other matters included the Shaws' contentions that the County had imposed improper designations on the property involving uses permitted by zoning, the coastal zone, a scenic corridor, and an agricultural buffer that were the subject of the Shaws' proposed supplemental complaint and as to which the Shaws had never mounted an administrative challenge such that the County's action could legally amount to inverse condemnation.

But at a certain point, the court began to question the relevance of this evidence by observing that the only issues before it in the bifurcated trial were the question of the County's liability in inverse condemnation regarding the electrical permit denial and common law torts. The Shaws conceded at that point that there was not any need for them to establish in the bifurcated

---

[27] Nor did it dispose of their Fifth Amendment takings claim, as to which they had already conceded a lack of ripeness as their state remedies had not yet been exhausted, their First Amendment claims, or their various other state-law causes of action.

[28] This left remaining the damage elements of the bifurcated claims as well as the Shaws' claims for injunctive relief, taxpayer relief, declaratory relief, and federal constitutional rights/civil rights violations.

portion of the trial whether the County had acted reasonably, presumably because this question related to their due-process-violation claims that were not then before the court. Yet they sought to introduce evidence relating to this question later in the course of the bifurcated trial. The court was clear in response that evidence concerning the County's reasonableness could be taken later and that the Shaws were not "out of court" on the subject, i.e., on their due process claims. The court also indicated that even during the course of the bifurcated trial, it was open to considering evidence that the County had in effect asserted in response to a development application that the "property is going to be developed over my dead body" and invited the Shaws to produce any such evidence.

But the court still sustained the County's relevance objections at trial to matters that it considered beyond the scope of the issues the court was then actually trying in the bifurcated proceeding. For example, the court excluded as irrelevant some of the Shaws' evidence concerning the proposed shed because, in its view, this did not relate to the particular inverse condemnation issue that was before the court—the permit to connect electricity—and because the County's position regarding the shed did not rise to the level of arbitrariness, bad faith, vindictiveness, action based on personal animosity, or intentional unwillingness to apply applicable zoning and land use standards that the court considered would establish the futility exception to the general takings requirement that a claimant exhaust administrative remedies so that the claim is ripe for adjudication. (See *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 190–191, 194–195 [87 L.Ed.2d 126, 105 S.Ct. 3108] (*Williamson*); *Del Monte Dunes v. City of Monterey* (9th Cir. 1990) 920 F.2d 1496, 1501; *Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 649–651 [43 Cal.Rptr.3d 434].)[29]

---

[29] The two-part ripeness test requires (1) that "the government entity charged with implement[ation of] the regulations has reached a final decision regarding the application of the regulations to the property at issue" (*Williamson, supra*, 473 U.S. at p. 186) and (2) that the claimant has sought and has been denied "compensation through the procedures the State has provided for doing so." (*Id.* at p. 194, fn. omitted.) The reason for the requirement is that a " 'court cannot determine whether a regulation goes "too far" [so as to constitute a taking] unless it knows how far the regulation goes.' " (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 622 [150 L.Ed.2d 592, 121 S.Ct. 2448] (*Palazzolo*).) A narrow exception to this requirement exists where there is certainty as to the land's permitted use because, for example, the agency lacks discretion to permit any development or the permissible uses of the property have already been made known to a reasonable degree of certainty and, thus, exhaustion of state remedies would be idle or futile. (*Id.* at pp. 620, 622; *Dunn v. County of Santa Barbara, supra*, 135 Cal.App.4th at pp. 1299–1301 [ripeness requirement satisfied where county stated with certainty that property could not be subdivided and that only one residence would be permitted]; *Calprop Corp. v. City of San Diego* (2000) 77 Cal.App.4th 582, 593–596, 594 [91 Cal.Rptr.2d 792] (*Calprop*) [" 'The futility exception is extremely narrow: "[T]he mere possibility, or even the probability, that the responsible agency may deny the permit should not

At one point, the Shaws' counsel made an offer of proof in response to one of the court's rulings excluding evidence as irrelevant. The offer amounted to the assertion that the County's positions regarding the shed, and other matters, none of which had been pursued by formal application except for the electrical permit, were unreasonable and amounted to mistreatment—hardly an establishment of the narrow futility exception.[30]

During closing argument, the Shaws' counsel again referenced the ways in which the Shaws contended that they had been treated unreasonably by the County in the context of their due process claims, even though these claims were clearly not then before the court. With respect to the inverse condemnation claim, which was before the court, the Shaws' counsel also referenced this allegedly unreasonable treatment and argued it under *Landgate*, stating, "*Landgate* was a California Supreme Court [case] and that's what we look to."[31] He also conceded that the property had historically been used for "recreational" purposes, referring to the Shaws' only historical use of the property for native-plant restoration.

The bifurcated trial concluded with the court's announcement that it would issue its decision in writing. Defense counsel inquired if that would be in the form of a statement of decision. The court replied that it would be a "memorandum decision." No party requested a statement of decision either then or later.

### E. The Court's Memorandum Decision and Judgment

Two months after the bifurcated portion of the trial ended, the court issued its written memorandum decision. The court began by referencing that it had ruled on various pretrial motions as a result of which the issues that were tried were "whether the County was responsible on theories of trespass, nuisance, and/or negligence in allowing exotic grass seeds onto [the Shaws'] property and whether there has been a compensable taking of [the Shaws'] property as a result of erroneously failing to issue a well hookup permit."

With respect to the tort claims, the court concluded that there had been a "failure of proof" as to the element of causation, i.e., whether the county's conduct caused the introduction or migration of nonnative plant species or grasses onto the property.

---

be enough to trigger the excuse. [Citations.] To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." [Citation.]' "].)

[30] See preceding footnote.

[31] The Shaws did not cite to or argue the applicability of *Lingle v. Chevron U. S. A. Inc.* (2005) 544 U.S. 528 [161 L.Ed.2d 876, 125 S.Ct. 2074] (*Lingle*), which they argue for the first time on appeal had the effect of overruling *Landgate*.

With respect to the Shaws' inverse condemnation claim, the court acknowledged that it had already been determined through the earlier proceedings in mandate that the County had erroneously failed to issue the Level I permit to set the electrical meter and that under the "appropriate circumstances[,] the delay caused by the failure to issue a land use permit may be compensable." The court then detailed the timeline from the Shaws' initial application for the permit in October 2000 until the hearing in mandate on this issue in March 2003 and attributed much of this delay to the Shaws' "desire to conduct discovery rather than any conduct of the County in delaying the litigation." The court noted that the County was at all times willing to "support a Level [V] (discretionary) permit process, but [the Shaws] wanted to avoid such a full public hearing process. At no time pertinent to the pendency of their well hookup permit application did [the Shaws] file an application regarding the development of their property nor have they done so since 2003. [The Shaws] continued to use their property for recreational purposes throughout this time. It is difficult to understand under these circumstances how it can be argued that [the Shaws] have been denied all economically beneficial . . . or productive use of their property."

But the court also observed that "the conduct of the County needs to be discussed. During the time this permit application was being processed the County Planning Department was either woefully understaffed or poorly organized or both. Phone calls were not returned as a matter of routine. It is easy enough to understand that there would be errors in permit application processing. Without sufficient time, County planners did not have the time to step back and use common sense in applying their regulations. Certainly, [the Shaws] should have been provided with a copy of the [policy memo], although it does not appear in retrospect, given the position of the parties at that time, that such provision would have made any difference. The mere error in failing to issue a permit is not compensable without more. [*Landgate*.] It cannot be said that the County's position was not backed by a legitimate public interest. Always of concern from the landowner's [perspective] is whether a position taken by the public entity was the result of an unofficial anti-development philosophy. Such does not appear to be the case as it relates to this application. There also appears to have been a poor mix of personalities, but that does not explain the result. There has been no compensable taking."

The memorandum decision finally directed the County to "prepare a form of judgment and submit same to the court pursuant to Rule 391 [of the California Rules of Court]."[32] County counsel prepared a form of judgment

---

[32] This rule, which has since been renumbered rule 3.1312 of the California Rules of Court, applies to orders on motions and *not to judgments*, the entry of which is governed by distinct procedural statutes and rules. (See, e.g., §§ 577 et seq., 632 & 664 et seq.; Cal. Rules of Court,

and sent it to the Shaws' counsel for approval. The Shaws' counsel did not sign the proposed judgment for approval as to form but apparently indicated to the County's counsel that he had no objection to it. County counsel then submitted the form of judgment to the court by letter with the representation that the Shaws' counsel had no objection. The Shaws' counsel was copied on the letter and did not contradict this representation. The court thereafter signed and entered the judgment.

The judgment attached a copy of the court's memorandum decision. It provided, "Based on the factual findings set forth in the Memorandum of Decision, it is hereby ORDERED, ADJUDGED AND DECREED that judgment is entered for [defendants] and against [the Shaws]." It also stated, "[The Shaws'] complaint in this case is hereby dismissed with prejudice." Notice of entry of judgment followed, which was itself followed by the Shaws' notice of appeal.[33,34]

rule 3.1590.) Rule 3.1312 generally provides for the prevailing party on a *motion* to prepare and deliver a proposed order to the opposing party within five days of the ruling. Then, within five days, the opposing party must notify the prevailing party as to whether or not the proposed order is approved. "The opposing party must state any reasons for disapproval. Failure to notify the prevailing party within the time required shall be deemed an approval." Upon the expiration of the five-day approval period, the prevailing party must "promptly transmit the proposed order to the court together with a summary of any responses of the other parties or a statement that no responses were received." (Cal. Rules of Court, rule 3.1312(a), (b).)

[33] The notice of appeal states that it is from the "Notice of Entry of Judgment After Court Trial served November 28, 2006." Of course, one appeals from the *judgment*, not the notice of entry of judgment. Nevertheless, we will construe the timely notice liberally and consider it to be from the judgment.

[34] The judgment was entered on November 22, 2006, and notice of its entry served on November 28, 2006. The notice of appeal was filed on January 18, 2007. On the same day, a document entitled "STIPULATION FOR JUDGMENT RE DEFENDANTS' LITIGATION COSTS; JUDGMENT" was filed. The document reflected a stipulation between the parties to resolve defendants' claims for costs as prevailing parties. The stipulation provided that the Shaws agreed "to entry of judgment against them in the amount of [$13,450.00] for Defendants' costs of litigation." The document then provided that based on the stipulation, "this Court orders judgment against [the Shaws] and for [defendants] in the amount of [$13,450.00] for full satisfaction of Defendants' costs of litigation through trial in this action. This judgment is enforceable jointly and severally against all Plaintiffs."

We cannot tell if this second "judgment," which violates the one final judgment rule, was filed before the notice of appeal, which arguably would have had the effect of superseding the prior judgment and making it nonappealable, or after the notice of appeal, which event would have deprived the trial court of the jurisdiction to enter the second judgment. Because the record on this point is not clear, and to reflect what we believe was the actual intention of the parties, we will construe the second "judgment" not as a judgment but as a postjudgment order on costs and attorney fees. This construction saves the appeal despite the irregularities below and spares us the need to determine the order in which the documents were filed. That the parties considered the second judgment to be a final money judgment supports our conclusion that the Shaws abandoned or acquiesced in the dismissal with prejudice below of their outstanding claims or causes of action.

## DISCUSSION

### I. *Issues on Appeal*

As we see it, the Shaws essentially challenge the court's judgment against them on their state-law claims for inverse condemnation, nuisance, and trespass.[35] They also claim that the court erred by excluding evidence during the course of the bifurcated trial of these claims. They further contend that the court erred by disposing of their federal claims for violation of civil rights and due process on the basis that these claims were not ripe.[36] To the extent their briefing raises other issues, for example whether the County's 1988 denial of their minor land division application was reasonable; whether designated zoning overlays potentially affecting the property's development for the coastal zone, scenic corridor, and agricultural buffers were properly imposed by the County; whether the County's zoning of the property is consistent with the general plan; and whether the County's response to the Shaws' informal proposal for building a shed was unreasonable, we do not see these matters as necessary to our appellate decision and we accordingly decline to resolve them. (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1].)

### II. *Legal Overview*

#### A. *Takings*

■ The state and federal Constitutions guarantee real property owners "just compensation" when their land is "taken . . . for a public use . . . ." (Cal. Const., art. I, § 19; see U.S. Const., 5th Amend.; *Lingle, supra,* 544 U.S. at p. 547; *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 773 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*).) The Fifth Amendment's takings clause, made applicable to the states through the Fourteenth Amendment, does not prohibit the taking of private property. Rather, it places a condition—payment of just compensation—on the exercise of that power.

---

[35] They do not appear to be challenging the judgment against them on their negligence cause of action as it is not addressed in their briefing.

[36] Particularly with respect to this last claim, the Shaws frame the issue as if the court actually made a dispositive ruling in limine on their due process violation claims. As we conclude below, the court made no such ruling, only later dismissing the entire complaint with prejudice by entry of the judgment. Furthermore, it is only from respondents' brief and our own review of the record that the underlying facts of this case and what actually happened below become clear. We accordingly agree with respondents that the Shaws did not include in their briefing, which totals 117 pages, a complete, sufficient, or accurate recitation of the evidentiary facts and procedure in the court below with adequate citation to the record. In fact, in their three-page "Statement of the Case," the Shaws cite mostly to their trial brief and not to the actual evidence contained in the record.

(*Lingle, supra*, 544 U.S. at p. 536; *Kavanau, supra*, at p. 773.) The federal takings clause " 'is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking.' " (*Lingle, supra*, at p. 537, italics omitted.) Although the California Constitution affords somewhat broader protection by also requiring compensation when property is damaged for public use, apart from this difference, the state takings clause is construed congruently with the federal clause. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664 [117 Cal.Rptr.2d 269, 41 P.3d 87].)

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property"—a categorical taking. (*Lingle, supra*, 544 U.S. at p. 537; see *Brown v. Legal Foundation of Wash.* (2003) 538 U.S. 216, 233 [155 L.Ed.2d 376, 123 S.Ct. 1406].) But "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and . . . such 'regulatory takings' may be compensable under the Fifth Amendment." (*Lingle, supra*, at p. 537.) The United States Supreme Court has recognized "that a regulation of property that 'goes too far' may effect a taking of that property, though its title remains in private hands. In such a case, the property owner may bring an inverse condemnation action, and if it prevails, the regulatory agency must either withdraw the regulation or pay just compensation. [Citation.] Even if the agency withdraws the regulation, the property owner may have a right to just compensation for the temporary taking while the regulation was in effect. [Citation.]" (*Kavanau, supra*, 16 Cal.4th at p. 773.)

■ Two categories of regulatory action will generally be deemed per se compensable takings. First, where government requires an owner to suffer a "permanent physical invasion" of his property for such things as cable lines, it must provide just compensation. (*Lingle, supra*, 544 U.S. at pp. 538–539, citing *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 432 [73 L.Ed.2d 868, 102 S.Ct. 3164] [a permanent physical invasion of property, however slight, eviscerates owner's right to exclude others from entering and using the property—the most fundamental of all property interests].) Second, where the government action does not result in any physical invasion of the property, the action will still be considered a taking if the regulation deprives the owner of "*all* economically beneficial or productive use of [the] land." (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [120 L.Ed.2d 798, 112 S.Ct. 2886] (*Lucas*), italics added; see *Lingle, supra*, 544 U.S. at pp. 537–539 [the complete elimination of a property's value is the determinative factor in the *Lucas* context].) "[T]he government must pay just compensation for such 'total regulatory takings,'

except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." (*Lingle, supra*, 544 U.S. at p. 538.)

Regulatory takings challenges outside these two categories, i.e., those that do not involve a physical invasion or that leave the property owner with some economically beneficial use of the property, are governed by the "essentially ad hoc, factual inquiries" set forth in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 98 S.Ct. 2646] (*Penn Central*).[37] (*Lingle, supra*, 544 U.S. at pp. 538–539; *Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 14 [34 Cal.Rptr.3d 588] (*Herzberg*).) There is no set formula but " 'several factors . . . have particular significance.' [Citation.] Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' [Citation.] In addition, the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred. [Citation.] The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principle guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules."[38] (*Lingle, supra*, 544 U.S. at pp. 538–539; see *Herzberg, supra*, 133 Cal.App.4th at p. 14.)

---

[37] The United States Supreme Court in *Lingle* set aside from these three inquiries the special takings context of land use exaction cases exemplified by *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*) and *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*). (*Lingle, supra*, 544 U.S. at pp. 538, 546–548.) These cases present the scenario of government demanding that a landowner dedicate a portion of his or her property for public use as a condition of obtaining a development permit. In these specific cases, a two-part test is applied. "First, there must exist an 'essential nexus' between the ' "legitimate state interest" ' the government asserts will be furthered by the condition of a development permit and the exaction itself. [Citations.] Second, there must exist a 'rough proportionality' between a development restriction imposed on a landowner and the extent of the impact the state imposed development condition is supposed to mitigate." (*Action Apartment Assn. v. City of Santa Monica* (2008) 166 Cal.App.4th 456, 469 [82 Cal.Rptr.3d 722].) In *Lingle*, the court clarified that to the extent this test for exaction cases applies a means-ends analysis now not otherwise permitted in takings cases, it is not inconsistent with the *Lingle* holding because exactions already involve dedications of property so onerous that outside that context, they would be deemed per se takings and the question of the legitimacy of the government's action is not used to make this determination. (*Lingle, supra*, 544 U.S. at pp. 546–548.)

[38] The California Supreme Court has identified from United States Supreme Court cases (but prior to *Lingle*) a number of additional, nonexclusive factors that might be relevant considerations in a particular case of an alleged *Penn Central* regulatory taking, none of which the Shaws specifically rely on. "These include '(1) whether the regulation "interfere[s] with interests that [are] sufficiently bound up with the reasonable expectations of the claimant to

■ The *Penn Central* factors aim to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights." (*Lingle, supra,* 544 U.S. at p. 539; see *Herzberg, supra,* 133 Cal.App.4th at p. 14.) "[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." (*Lingle, supra,* 544 U.S. at p. 540.) Moreover, application of the *Penn Central* factors is informed by the purpose of the takings clause, which is to prevent the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " (*Palazzolo, supra,* 533 U.S. at p. 618.) In other words, the "appraisal of these complicated factors is to prevent, in the framework of [the particular] case, [a claimant] from unfairly bearing public burdens which the body politic as a whole should be compelled to accept. [Citations.]" (*Action Apartment Assn. v. City of Santa Monica, supra,* 166 Cal.App.4th at p. 469.)

Nearly three decades ago in *Agins v. Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138] (*Agins*), the United States Supreme Court declared that government regulation of private property "effects a taking if [such regulation] does not substantially advance legitimate state interests . . . ." (*Agins, supra,* at p. 260.) As a result of *Agins,* this language—suggesting a stand-alone, means-end analysis—became ensconced in the court's Fifth Amendment takings jurisprudence. (*Lingle, supra,* 544 U.S. at p. 531; *Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 704 [143 L.Ed.2d 882, 119 S.Ct. 1624], citing cases (*Del Monte Dunes*).) But, even over many years, the United States Supreme Court still did not find in

constitute 'property' for Fifth Amendment purposes" [citation]; (2) whether the regulation affects the existing or traditional use of the property and thus interferes with the property owner's "primary expectation" [citation]; (3) "the nature of the State's interest in the regulation" [citations] and, particularly, whether the regulation is "reasonably necessary to the effectuation of a substantial public purpose" [citation]; (4) whether the property owner's holding is limited to the specific interest the regulation abrogates or is broader [citation]; (5) whether the government is acquiring "resources to permit or facilitate uniquely public functions," such as government's "entrepreneurial operations" [citation]; (6) whether the regulation "permit[s the property owner] . . . to profit [and] . . . to obtain a 'reasonable return' on . . . investment" [citation]; (7) whether the regulation provides the property owner benefits or rights that "mitigate whatever financial burdens the law has imposed" [citations]; (8) whether the regulation "prevent[s] the best use of [the] land" [citation]; (9) whether the regulation "extinguish[es] a fundamental attribute of ownership" [citation]; and (10) whether the government is demanding the property as a condition for the granting of a permit [citations].' [Citation.] The factors should not be used as [a] checklist, but applied only as appropriate. [Citation.] There is no ' " 'set formula' " ' for identifying a taking. [Citations.]" (*Herzberg, supra,* 133 Cal.App.4th at p. 15.)

any single case since *Agins* a compensable taking based on this inquiry, instead merely assuming the validity of the " 'substantially advances' " formula when referring to it in dicta. (*Lingle, supra,* at p. 546.)

█ In *Lingle,* the court held that the "substantially advances" formula is not a valid takings test and that it has no place in the court's takings jurisprudence.[39] (*Lingle, supra,* 544 U.S. at p. 548.) In so doing, the court reaffirmed that "a plaintiff seeking to challenge a government regulation as an uncompensated taking of private property may proceed under one of the other theories discussed [therein]—by alleging a 'physical' taking, a *Lucas*-type 'total regulatory taking,' a *Penn Central* taking, or a land-use exaction violating the standards set forth in *Nollan* and *Dolan.*" (*Ibid.*) Because the court decided no takings case between *Agins* and *Lingle* on the basis of the " 'substantially advances' " language, it emphasized in *Lingle* that its holding would not require the court "to disturb any of [its] prior holdings." (*Lingle, supra,* 544 U.S. at p. 545.)

The same might not necessarily be said of California takings case law that rests upon the *Agins* "substantially advances" formula such as *Landgate,* argued below by both sides and cited by the trial court in its memorandum decision. In *Landgate,* the California Supreme Court used the *Agins* " 'substantially advances' " standard in addressing whether an agency's erroneous land use decision constituted a temporary taking entitling the landowner to compensation or whether the agency's action amounted instead to noncompensable normal delay in development.[40] (*Landgate, supra,* 17 Cal.4th at pp. 1010, 1018.) The court held that a delay in the issuance of a development permit because of the mistaken assertion of jurisdiction by a government agency is a normal delay that, by itself, does not constitute a temporary taking. (*Id.* at pp. 1010, 1020–1021.) But the court also noted that a

---

[39] The court's holding is grounded in the concept that for purposes of Fifth Amendment takings jurisprudence, the legitimacy of the government's action is assumed. What is at issue is the government's obligation to compensate the landowner for the valid action. (*Lingle, supra,* 544 U.S. at pp. 543–545.) This analysis is distinct from Fourteenth Amendment due process considerations in the application of which a court may properly probe whether a regulation substantially advances a legitimate government purpose or whether a regulation is arbitrary or unreasonable. (544 U.S. at pp. 540–544 [formula prescribes an inquiry sounding in due process, not takings, because the failure of a regulation to accomplish a stated or obvious objective renders the regulation arbitrary or irrational so as to violate due process].)

[40] The Supreme Court in *Landgate* took its cue from *First Lutheran Church v. Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378], in which the United States Supreme Court identified two reasons why a regulation temporarily denying an owner all use of her property might not constitute a taking. One of those reasons involved questions that "arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like," issues that were not before the court in that case. (*Id.* at p. 321; see *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 328–329 [152 L.Ed.2d 517, 122 S.Ct. 1465].)

government agency may not evade the takings clause by fabricating a dispute or by otherwise arbitrarily imposing conditions on development to delay or discourage it. (*Id.* at p. 1029.) Under *Landgate*, the government's assertion of authority, whether or not erroneous, must advance some legitimate purpose, which is measured not by inquiry into the subjective motive of the government agency but by "whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter. [Citations.]" (*Id.* at p. 1022.) If so, then there is generally no taking. But the court further observed that even though a regulation substantially advanced a legitimate governmental purpose, if the agency's "position was so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development project before it," such a tactic would not advance any valid government objective and would amount to a taking. (*Id.* at p. 1024.) To constitute a noncompensable normal delay in development as opposed to a taking then, an agency's position advocated in a bona fide dispute must be plausible or objectively reasonable even though it may later be determined to be erroneous.[41] (17 Cal.4th at pp. 1025, 1028.)

Although to date, there are no California appellate cases that expressly hold that *Landgate* did not survive *Lingle* (*Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1280–1285 [42 Cal.Rptr.3d 122] (*Allegretti*) [applying *Landgate* as an alternative holding to conclude no taking without deciding whether *Landgate* survived *Lingle*]; *Los Altos El Granada Investors v. City of Capitola, supra*, 139 Cal.App.4th at p. 651 [generally noting that *Lingle* undermined the " 'substantially advances' " formula in general takings jurisprudence but not deciding its effect on *Landgate*]), some federal cases have held that *Lingle* undercuts or even eviscerates prior takings jurisprudence that had applied, as *Landgate* did, a test emphasizing the legitimacy of the governmental purpose when determining whether there had been a compensable taking.[42] (*Crown Point Development v. City of Sun Valley* (9th Cir. 2007) 506 F.3d 851, 855–856 (*Crown Point*); *North Pacifica LLC v. City of Pacifica* (9th Cir. 2008) 526 F.3d 478, 484–485 (*North Pacifica*);

---

[41] The facts and result in *Landgate* were distinguished in *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246 [91 Cal.Rptr.2d 458] (*Ali*). There, the Court of Appeal held that the city's position was so unreasonable from a legal standpoint as to be arbitrary and thus not in furtherance of any legitimate government objective. (*Id.* at pp. 252–255.)

[42] But this is not so in the context of due process jurisprudence, from which the "substantially advances" formula was imprecisely borrowed and where it still holds true, as we observe below. In this context, where a regulation's underlying validity is probed, questions of the regulation's legitimacy, reasonableness, and arbitrariness are proper. (*Lingle, supra*, 544 U.S. at pp. 540–544, 548–549 (conc. opn. of Kennedy, J.) [*Lingle* does not foreclose the "possibility that a regulation might be so arbitrary or irrational as to violate due process. [Citation.] The failure of a regulation to accomplish a stated or obvious objective would be relevant to that inquiry"].)

*Los Altos El Granada Investors v. City of Capitola* (N.D.Cal., July 26, 2005, No. C-04-5138-JF (PVT)) 2005 U.S.Dist. Lexis 36804; *S.G. Borello & Sons, Inc. v. City of Hayward* (N.D.Cal., Nov. 20, 2006, No. C 03-0891 VRW) 2006 U.S.Dist. Lexis 86293; *MHC Financing Limited Partnership v. City of San Rafael* (N.D.Cal., Dec. 5, 2006, No. C 00-3785 VRW) 2006 U.S.Dist. Lexis 89195.)[43]

### B. *Due Process Contrasted*

■ While the takings clauses of the state and federal Constitutions guarantee property owners "just compensation" when their property is taken for public use (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.), "[t]he due process clauses of the state and federal Constitutions guarantee property owners 'due process of law' when the state 'deprive[s them] of . . . property.'[44] (Cal. Const., art. I, §§ 7, 15; U.S. Const., 14th Amend., § 1.)" "These distinct constitutional protections limit the legislative power of government in different but related ways. The due process protection focuses on the government's means and purpose: whether the government's method rationally furthers legitimate ends. The takings protection focuses on the impact of the government's action: whether the government has in effect appropriated private property for its own use, rather than merely regulating a private use of the property." (*Kavanau, supra,* 16 Cal.4th at pp. 770–771.)

The state and federal due process clauses prohibit "government from depriving a person of property without due process of law. (Cal. Const., art. I, §§ 7, 15; U.S. Const., 14th Amend., § 1.) These provisions guarantee appropriate procedural protections [citation] and also place some substantive limitations on legislative measures [citations]. The latter guaranty—sometimes described as substantive due process—prevents government from enacting legislation that is 'arbitrary' or 'discriminatory' or lacks 'a reasonable relation to a proper legislative purpose.' [Citation.]" (*Kavanau, supra,* 16 Cal.4th at p. 771.) A procedural due process claim on the other hand requires

---

[43] Citing unpublished federal opinions does not violate our rules. (Cal. Rules of Court, rule 8.1115; *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 [72 Cal.Rptr.3d 112, 175 P.3d 1170].)

[44] The due process provisions of the California Constitution are the substantial equivalent of portions of the Fourteenth Amendment and they evoke substantially the same standards as those prescribed by the federal Constitution. (*Russell v. Carleson* (1973) 36 Cal.App.3d 334, 342 [111 Cal.Rptr. 497].) But the California due process clause does not create a private right of action for money damages. (*Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 329 [127 Cal.Rptr.2d 482, 58 P.3d 339].) A federal due process violation through which money damages are sought may be raised through the vehicle of 42 United States Code section 1983, as it was here, which creates a private right of action and as to which there is a right to a jury trial no matter which constitutional provision is being asserted. (*Del Monte Dunes, supra,* 526 U.S. at p. 709 [§ 1983 suit is an action at law within the meaning of the 7th Amend.].)

a deprivation of a constitutionally protected interest and a denial of adequate procedural protections. (*Brewster v. Bd. of Educ. of Lynwood U. School Dist.* (9th Cir. 1998) 149 F.3d 971, 982; *Wright v. Riveland* (9th Cir. 2000) 219 F.3d 905, 913.) Although what procedural process is due in a given circumstance may vary, it "*always* requires a relatively level playing field, the 'constitutional floor' of a 'fair trial in a fair tribunal,' in other words, a fair hearing before a neutral or unbiased decision-maker. [Citations.]" (*Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 90 [133 Cal.Rptr.2d 234], quoting *Bracy v. Gramley* (1997) 520 U.S. 899, 904–905 [138 L.Ed.2d 97, 117 S.Ct. 1793].)

" '[The Takings Clause] "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference . . . ." Due process violations cannot be remedied under the Takings Clause, because "if a government action is to be found impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action." ' " (*Action Apartment Association, Inc. v. Santa Monica Rent Control Opinion Board* (9th Cir. 2007) 509 F.3d 1020, 1026, fn. 1 (*Action Apartment*).)

██ Although in recent years, substantive due process in the context of land use regulation has taken "a winding path" (*North Pacifica, supra,* 526 F.3d at p. 484), the United States Supreme Court's holding in *Lingle* made clear "that a challenge to land use regulation may state a substantive due process claim, so long as the regulation serves no legitimate governmental purpose." (*Ibid.*) Where there is a substantive due process challenge to a government's delays in processing a property-related application, the claimant must show that the delays "lacked a rational relationship to a government interest." (*North Pacifica, supra,* 526 F.3d at p. 485, citing *Crown Point, supra,* 506 F.3d at p. 856.) In other words, in the substantive due process realm, it is not the extent of the burden to be borne by the landowner that is the focus of the inquiry. It is rather the reasonableness of the government regulation or exercise of police power and the rational relationship of the regulation or action to a government purpose. (*Lingle, supra,* 544 U.S. at p. 542 [due process is violated where regulation is so arbitrary or irrational that it fails to serve any legitimate governmental objective]; *Crown Point, supra,* 506 F.3d at p. 856 [due process claim lies where land use action lacks any substantial relation to the public health, safety, or general welfare; delays in processing application violate due process where they lack a rational relationship to a government interest]; *Action Apartment, supra,* 509 F.3d at p. 1026 [substantive due process claim must show government deprivation of life, liberty, or property; arbitrary deprivation of right to devote property to any legitimate use gives rise to viable claim]; *PruneYard Shopping Center v. Robins* (1980) 447 U.S. 74, 84 [64 L.Ed.2d 741, 100 S.Ct. 2035] [Does the

regulation have a legitimate purpose to which the restriction bears a rational connection?]; *Pennell v. San Jose* (1988) 485 U.S. 1, 12 [99 L.Ed.2d 1, 108 S.Ct. 849] [Is the legislation arbitrary, discriminatory, or demonstrably irrelevant to the legislative policy it seeks to implement?]; *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 849 [140 L.Ed.2d 1043, 118 S.Ct. 1708] [Was the action intended to injure in some way unjustified by any government interest?].)

Thus, although the facts and circumstances of a particular deprivation of property might constitute a taking or a due process violation, the claims are legally distinct and are subject to different analytical tests. With this in mind, we proceed to address the Shaws' claims on appeal, after a brief, but necessary, in this case, diversion to revisit some basic principles of appellate review.

### III. *Applicable Limits and Scope of Appellate Review*

To this appeal, like every other, we apply basic tenets prescribing the scope and limits of appellate review, starting with the most fundamental—the presumption of correctness. An appealed judgment is presumed to be correct. We will indulge all intendments and presumptions to support the judgment on matters as to which the record is silent and prejudicial error must be affirmatively shown. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)

Particularly pertinent here, and not addressed by either side, is the doctrine of implied findings. This doctrine requires that in the absence of a statement of decision,[45] an appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362], superseded on other grounds by statute as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448–449 [24 Cal.Rptr.2d 751, 862 P.2d 751]; *In re Marriage of*

---

[45] Section 632 provides in pertinent part that "upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. [Upon timely request, t]he court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principle controverted issues at trial . . . ." Section 634 further provides in pertinent part that "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue."

*Arceneaux, supra,* 51 Cal.3d at pp. 1133–1134; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 [58 Cal.Rptr.3d 225].)

An applicable corollary to the doctrine of implied findings is the rule that a trial court's tentative or memorandum decision is no substitute for a statement of decision. "In a nonjury trial the appellant preserves the record by requesting and obtaining from the trial court a statement of decision pursuant to California Code of Civil Procedure section 632 [and rule 3.1590 of the California Rules of Court]. The statement of decision provides the trial court's reasoning on disputed issues and is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law." (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718 [30 Cal.Rptr.2d 745].) "A memorandum opinion is not a decision. Although it may purport to decide issues in the case, it is merely an informal statement of the views of the trial judge. It does not constitute findings of fact." (*Taormino v. Denny* (1970) 1 Cal.3d 679, 684 [83 Cal.Rptr. 359, 463 P.2d 711].)

There are instances in which a court's oral comments may be valuable in illustrating the trial judge's theory, but they may never be used to impeach the order or judgment on appeal. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646 [253 Cal.Rptr. 770] (*Ditto*).) This is because a trial court retains inherent authority to change its decision, its findings of fact, or its conclusions of law at any time before entry of judgment and then the judgment supersedes any memorandum or tentative decision or any oral comments from the bench. (*Darling, Hall & Rae v. Kritt* (1999) 75 Cal.App.4th 1148, 1156–1157 [89 Cal.Rptr.2d 676]; *Taormino v. Denny, supra,* 1 Cal.3d at p. 684.) Thus, a trial judge's prejudgment oral expressions do not bind the court or restrict its power to later declare final findings of fact and conclusions of law in the judgment. (*Ditto, supra,* 206 Cal.App.3d at pp. 646–647.) In the absence of a statement of decision, a reviewing court looks only to the judgment to determine error. (*Id.* at p. 648.) Absent contrary indication in the final judgment or statement of decision, the appellate court will assume that, during the period before rendition of judgment, the trial court realized any error and corrected it. (*Oldis v. La Societe Francaise de Bienfaisance Mutuelle* (1955) 130 Cal.App.2d 461, 472 [279 P.2d 184].)

So, as here, where the option of requesting a statement of decision under sections 632 and 634 is available, the trial court's less formal comments on the record or in the minutes are insufficient to form the basis of reversible error. As explained in *Ditto,* a trial court's reasons " 'do not in a strict sense constitute a part of the record on appeal.' " (*Ditto, supra,* 206 Cal.App.3d at p. 646; see *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 161 [130 Cal.Rptr. 465, 550 P.2d 1001].) Consequently, " '[t]he memorandum decision cannot be relied upon to fill the interstices in the findings and conclusions left

void by the failure to find pursuant to a properly filed request . . .' " for a statement of decision. (*Ditto, supra*, at p. 647.) Where the trial court has issued a tentative or memorandum decision, an appellate court is permitted to examine it to help interpret the lower court's findings or conclusions, and we will not ignore the record, but the function of a memorandum decision on appellate review is very limited and it "will not be used in determining whether or not the . . . findings . . . are supported by the evidence." (*Balding v. Atchison, T. & S. F. Ry. Co.* (1964) 225 Cal.App.2d 254, 258 [37 Cal.Rptr. 215].)

Here, the judgment expressly incorporated the findings of fact (but not the conclusions of law) contained in the court's memorandum decision. This is sufficient to make the court's factual findings part of the judgment and they will accordingly guide our review of factual matters. (*Estate of Janes* (1941) 18 Cal.2d 512, 514 [116 P.2d 438] [findings of fact may be included in a judgment]; *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1494, fn. 3 [2 Cal.Rptr.2d 690].) But we are not similarly constrained as to the court's conclusions of law and the judgment here will not be impeached either by the court's oral comments or the memorandum decision as they pertain to legal theories or conclusions. A formal statement of decision enables a reviewing court to determine what law the trial court employed. A failure to request a statement of decision results in a waiver of findings and conclusions necessary to support the judgment and we will accordingly infer such conclusions.

Moreover, we will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473].) There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980–981 [35 Cal.Rptr.2d 669, 884 P.2d 126].)

These general rules, along with the proper standard of review through which we view each claim of error, inform our review of the judgment.

IV. *Substantial Evidence Supports the Trial Court's Judgment That There Was No Compensable Taking*

Whether the County's actions constituted a taking is a mixed question of law and fact. (*Ali, supra*, 77 Cal.App.4th at pp. 250–255; *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1553–1554 [49 Cal.Rptr.3d 259].) Our review is neither entirely de novo nor entirely limited by the substantial evidence rule. (*Ali, supra*, at p. 250.) "Mixed questions of law and fact involve three steps: (1) the determination of the historical

facts—what happened; (2) selection of the applicable legal principles; and (3) application of those legal principles to the facts. The first step involves factual questions exclusively for the trial court to determine; these are subject to substantial evidence review; the appellate court must view the evidence in the light most favorable to the judgment and the findings, express or implied, of the trial court. [Citations.]" (*Ibid.*) Thus, we do not apply de novo review to factual findings underlying the trial court's judgment, instead applying the substantial evidence rule. (*Ibid.*) Only the second and third steps involve questions of law, which we review de novo. (*Ibid.*)

The Shaws do not contend that the County's actions resulted in a physical taking of their property. But they do contend that the County's initial denial of their application to set the electrical meter constituted a per se temporary regulatory taking under *Lucas* because it denied them *all* economically beneficial use of the property, and if not that, then the denial amounted to a temporary taking under the *Penn Central* factors. Below, they argued under *Landgate* that the asserted excessive delay caused by the County's initial but erroneous denial of the electrical permit for the well amounted to a temporary taking. On appeal, for the first time, they argue that *Landgate* is no longer good law as a result of *Lingle* and that the trial court therefore erred by relying on it. But their fallback position is that even if *Landgate* survived *Lingle*, the trial court erred by concluding that there was no compensable taking under its holding. We conclude that under either *Lingle*, which identified remaining viable takings theories, or *Landgate*, on the facts found by the trial court and the record presented here, the judgment in favor of the County is correct.

Before reaching the analysis under either *Lingle* or *Landgate*, we recall the factual findings made by the trial court that were incorporated into the judgment. These were that (1) much of the delay between the Shaws' application for their electrical permit in October 2000 until the court heard their petition in mandate in March 2003 was due to the Shaws' desire to conduct discovery; (2) the County was always willing to entertain the application under a Level V, discretionary rather than ministerial, basis; (3) the Shaws did not submit any other development application regarding the property at any time relevant to the pendency of their electrical permit application; and (4) they continued to use their property for the very same purposes as they had before during the entire period between their permit application and the time of trial. Based on these facts, which are supported by the record, the court concluded as the ultimate fact that the Shaws had not been deprived of "all economically beneficial . . . or productive use of their property."

But the court also found that the County was "either woefully understaffed or poorly organized or both," affecting its ability to use common sense in

applying its regulations and contributing to errors. Despite this observation, the court still concluded that the County's position was "backed by a legitimate public interest," was not the result of an "anti-development philosophy," and that had the County provided the Shaws with the undisclosed policy memo, which was one of three reasons relied on by Glenda Hill in denying the Shaws' application but not the basis of the planning director's decision to uphold the denial, the respective positions of the parties would not have been any different.

## A.  *Post*-Lingle *Takings Analysis*

Under *Lucas, supra*, 505 U.S. at page 1015, a government regulation will result in a per se regulatory taking if it deprives the owner of all economically beneficial or productive use of the land. (*Kavanau, supra*, 16 Cal.4th at p. 774.) It is the *complete* elimination of a property's value that is the determinative factor in the *Lucas* context. (*Lingle, supra*, 544 U.S. at pp. 537–539.) This record is devoid of evidence that the County's initial denial of the Shaws' application for an electrical permit, or the passage of time until the permit ultimately issued, or the planning department's inadequacies or errors as found by the trial court, deprived the Shaws of all—or any—economically beneficial use of the property or that as a result of the denial, the property's value was eliminated or even reduced. Contrary to the Shaws' contentions, in this analysis, their ultimate vision of the property and their abstract goals for its future that were dependent on future applications for development do not establish that the County's actions in denying the electrical permit or the delays that followed resulted in the elimination of the property's value. Indeed, substantial evidence establishes that the Shaws continued to use their property exactly as they had before. And they offered no evidence of a loss of return on their property investment or of a reduced value. Accordingly, under the *Lucas* theory, neither the County's actions in denying the permit nor the subsequent passage of time until the point at which the trial court granted relief in mandate amounted to a taking.[46]

As we have noted, under the takings theories approved in *Lingle*, this leaves the question whether despite retaining economically beneficial use of the property, the Shaws still suffered a taking under the *Penn Central* factors, which is an essentially "ad hoc" inquiry mostly focusing on three factual inquiries that probe the severity of the burden imposed on private property

---

[46] Moreover, the Shaws' case management conference statements filed throughout the course of this litigation, which have been included in the record on appeal, confirm what the trial court found to be the case—that the multiyear delay between the filing of the complaint and the hearing in mandate may largely be attributed to the Shaws' desire to conduct discovery, which appears to have been the primary basis for their ongoing lack of readiness for a trial date.

rights and the extent to which the claimant has been unfairly forced to bear a public burden. (*Penn Central, supra,* 438 U.S. at p. 124; *Lingle, supra,* 544 U.S. at p. 539; *Palazzolo, supra,* 533 U.S. at p. 618.) These are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the government action, i.e., did it involve a physical invasion or merely a regulation adjusting societal burdens and benefits to promote the public good. (*Penn Central, supra,* at p. 124; *Lingle, supra,* 544 U.S. at p. 539; *Kavanau, supra,* 16 Cal.4th at p. 775.) This analysis turns in large part on "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." (*Lingle, supra,* 544 U.S. at pp. 539–540.) Although the *Penn Central* factors do not serve as a checklist, a court may dispose of a takings claim on the basis of one or two of them. (*Allegretti, supra,* 138 Cal.App.4th at p. 1277, and cases cited there; *Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1005 [81 L.Ed.2d 815, 104 S.Ct. 2862] [disposing of takings claim solely on absence of reasonable investment-backed expectations].)

■ In addressing the first of the three *Penn Central* factors, "we ask whether the regulation 'unreasonably impair[s] the value or use of [the] property' in view of the owners' general use of their property. (E.g., *PruneYard Shopping Center v. Robins*[, *supra,*] 447 U.S. [at p. 83] . . . .) Not only is the use to which the property owner puts his or her property important, but the economic impact needs to be considered in the context of other laws and regulatory schemes. [Citation.] We note the United States Supreme Court has repeatedly upheld land use regulations that destroy or adversely affect real property interests. [Citation.]" (*Allegretti, supra,* 138 Cal.App.4th at p. 1278.) The United States Supreme Court itself framed the question in *Penn Central* by asking "whether the interference with [the] property is of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it].'" (*Penn Central, supra,* 438 U.S. at p. 136.) This might be measured in several different ways, including looking to the market value of the property (*Hodel v. Irving* (1987) 481 U.S. 704, 714 [95 L.Ed.2d 668, 107 S.Ct. 2076]); looking to whether the regulation makes the property owner's business operation "commercially impracticable" (*Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 495–496 [94 L.Ed.2d 472, 107 S.Ct. 1232]); or looking to the possibility of other economic uses besides that prohibited by the challenged regulation (*Andrus v. Allard* (1979) 444 U.S. 51, 66 [62 L.Ed.2d 210, 100 S.Ct. 318]).

As we have already observed, the record here contains no evidence that as a result of the County's denial of the electrical permit, or the delay between

that denial and the trial court's relief in mandate, the property's value or its ongoing use by the Shaws was impaired. Nor was there any evidence that the County's action affected any commercial business operation associated with the property or indeed that the property was actually being used for any commercial purposes at all. From the time of their acquisition of the property until 2003 when they were ultimately granted the electrical permit, the Shaws were successfully restoring the property's native plantlife and the record does not show any attempt by them to derive any economic use or benefit from it. Under *Penn Central*, even regulations that prohibit the "most beneficial use of the property" or that prohibit "a beneficial use to which individual parcels had previously been devoted and thus cause[] substantial individualized harm" are not takings. (*Penn Central, supra*, 438 U.S. at p. 125.) Like most land use regulations, the ordinance may have " ' "the inevitable effect of reducing the value of regulated properties," ' " but even a " ' "significant diminution in value is insufficient to establish a confiscatory taking." ' " (*Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 912 [223 Cal.Rptr. 379], quoting *Griffin Development Co. v. City of Oxnard* (1985) 39 Cal.3d 256, 267 [217 Cal.Rptr. 1, 703 P.2d 339].) There was evidence here of the Shaws' ultimate vision and future plans for the property as a retreat center or residential development but there was no causal connection or relationship established between the County's action and delay in these potential plans. And the evidence established that the Shaws' only use of the property—for native plant restoration, whether or not characterized as a recreational endeavor—was entirely successful regardless of the County's denial of the electrical permit and the passage of time that followed. Accordingly, based on the *Penn Central* factor of economic impact, the record supports that there was no taking.

We move to the second *Penn Central* factor—the extent to which the County's regulatory action interfered with the Shaws' distinct investment-backed expectations. A " 'reasonable investment-backed expectation' " must be more than a " 'unilateral expectation or an abstract need.' " (*Ruckelshaus v. Monsanto Co., supra*, 467 U.S. at pp. 1005–1006.) Also important in analyzing this factor is the "nature and extent of permitted development under the regulatory regime vis-à-vis the development sought by the claimant." (*Palazzolo, supra*, 533 U.S. at p. 634 (conc. opn. of O'Connor, J.).) This factor thus may depend on whether the landowner seeks to engage in a use of land that is comparable to that which has been permitted to neighboring landowners. That is, a landowner has a reasonable expectation to use property in the same manner as similarly situated landowners. And a reasonable expectation may involve whether the landowner had constructive knowledge of the regulation when choosing to improve the property. (*Kavanau, supra*, 16 Cal.4th at p. 780.)

As their investment-backed expectations, the Shaws cite the "substantial economic investments" they have "poured in to" the property with the intent to "create a community of homes within a vibrant native plant environment." Necessary to this goal, they urge, "is the restoration and maintenance of a thriving native plant environment," in which they have invested and which, by all accounts, has been entirely successful in spite of any action or delay by the County.

The recurring problem with the Shaws' argument is that they draw no connection between the County's denial of the electrical permit, or the passage of time until the trial court granted relief in mandate, and a compromise of their future, abstract, and perhaps even speculative expectations for the property. After all, we are not presented with any County action or regulation that directly affected an application by the Shaws to build a community of homes. Moreover, the Shaws' abstract and vague expectations are not the slightest bit "distinct" so as to qualify as a " 'distinct investment backed expectation[]' " that would favor the finding of a taking. (*Allegretti, supra*, 138 Cal.App.4th at p. 1279.) Their stated expectations in applying for the electrical permit were to use the powered well to irrigate plants and for fire protection, not to build a community of homes. And the Shaws did not show that any other landowner in their circumstances had been granted such a ministerial permit or that the County's cited regulation in denying the permit was new or beyond their constructive notice. In fact, the evidence was that Glenda Hill, on the County's behalf, had many times before denied such permits on the same, but later held to be erroneous, basis where the subject property was lacking a main or accessory structure. The record thus supports that neither the County's action nor the subsequent passage of time directly affected any *distinct*, investment-backed expectations held by the Shaws that specifically related to their electrical permit application.

The third *Penn Central* factor inquires into the character of the regulation, a factor left unaddressed by the Shaws. The Supreme Court in *Penn Central* did not define the "character" factor except to say that it may depend on whether the regulation amounts to a physical invasion, which would lean towards a taking, or is instead more akin to a public program adjusting the burdens and benefits of economic life to promote the common good. (*Penn Central, supra*, 438 U.S. at p. 124.) There is no question but that the County's denial of the electrical permit here did not amount to a physical invasion of the property, which is perhaps why the Shaws do not discuss this factor.

■ Based on our analysis of the three primary *Penn Central* factors, we conclude that neither the County's regulatory action in denying the electrical permit, nor the delay the Shaws experienced from then until the point at which they were granted relief in mandate and the permit was issued, effected a taking. The record establishes that the actual magnitude of the economic impact of the County's regulatory action and the degree to which the action interfered with the Shaws' actual use of the property were minimal. Though the Shaws attempt to connect the totality of their property-restoration investment and their inchoate vision to develop the property into a residential community to the County's isolated action in initially denying the electrical permit, the record does not support this linkage. Our "appraisal of these complicated [*Penn Central*] factors is to prevent, in the framework of [the particular] case, [a claimant] from unfairly bearing public burdens which the body politic as a whole should be compelled to accept. [Citations.]" (*Action Apartment Assn. v. City of Santa Monica, supra,* 166 Cal.App.4th at p. 469.) We are convinced by our review in this case that the Shaws were not so unfairly burdened and that neither the County's actions regarding the electrical permit nor any associated delay amounted to a compensable taking under *Penn Central.*

B. *Takings Analysis Under* Landgate[47]

■ *Landgate*'s primary holding is that a delay in the issuance of a development permit because of the mistaken but plausible assertion of jurisdiction by a government agency is a normal delay that, by itself, does not constitute a temporary taking. (*Landgate, supra,* 17 Cal.4th at pp. 1010, 1020–1021.) But a government agency may not evade the takings clause by fabricating a dispute or by otherwise arbitrarily imposing conditions on development to delay or discourage that development. (*Id.* at p. 1029.) The test under *Landgate* is whether the government's assertion of authority, whether or not erroneous, advanced some legitimate purpose, which is measured not by inquiry into the subjective motive of the government agency but by "whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter. [Citations.]" (*Id.* at p. 1022.) Even if a regulation substantially advanced a legitimate governmental purpose, if the agency's "position was so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development project before it," such a tactic would not advance any valid government objective and so would amount to a taking. (*Id.* at pp. 1024–1025.)

---

[47] Because we conclude that there was no taking under any theory, we need not and do not decide whether *Lingle* undercuts *Landgate.*

Thus, under *Landgate*, "[l]iability for delay in processing a development proposal may only be imposed when it goes 'beyond that to be expected as part of the normal permit process.' [Citation.] The normal permit process includes the period in which a property owner must litigate with an agency 'over other threshold questions that must be resolved before it can be determined whether a development should be permitted to proceed.' (*Landgate, supra*, 17 Cal.4th at p. 1030.) Our Supreme Court has recognized that resolution of such threshold questions 'often turns on the construction and application of complex statutory schemes and results in significant delays in the development process.' (*Ibid.*) Notwithstanding the lengthy interval which may pass while such issues are resolved by way of litigation, the interval is not compensable because ' "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." [Citation].' (*Id.* at p. 1027.) Rather, 'a judicial determination of the validity of certain *preconditions to development* is a normal part of the development process, and the fact that a developer must resort to such a determination does not constitute a per se temporary taking.' (*Id.* at p. 1030.)" (*Calprop, supra*, 77 Cal.App.4th at p. 596.) This rule is of course qualified by what the court also held in *Landgate*—that the dispute must be bona fide and not for purposes of delay and that the assertion of authority, whether or not erroneous, must advance some legitimate government purpose. (*Ibid.*; *Landgate, supra*, 17 Cal.4th at p. 1029.)

The trial court here found that in spite of the County's understaffing and poor organization, its position in denying the Shaws' electrical permit was "backed by a legitimate public interest" and that that position was not "the result of an unofficial anti-development philosophy." The court further found that although the County should have provided the Shaws with the undisclosed policy memo on which Glenda Hill partly relied in denying the application, it did not appear that "such provision would have made any difference" given the parties' respective positions at the time.[48] Substantial evidence supports these findings.

The record on appeal also contains substantial evidence that the County's policy behind its application of Santa Cruz County Code section 13.10.611, subdivision (c)2—the reason for the permit denial as cited by the planning director in the Shaws' administrative hearing—was its concern that approving electrical service to vacant land in the past had led to the construction and

---

[48] As a stand-alone argument, the Shaws separately contend on appeal that the failure of the County to have provided them with a copy of this policy memo alone amounted to a taking. But they offer no legal theory or argument to support this conclusion. At the same time, they also contend that the County's failure to have provided them with the memo constituted a violation of their due process rights. We will treat this separate contention purely as a due process violation claim and will dispose of it, along with the rest of the Shaws' due process violation claims, below on the basis of forfeiture.

habitation of illegal dwelling structures and the use of power designated for a well to provide electrical service and water to the illegal structures. There was also substantial evidence in the record that the typical application for electrical service to power a well requested 60 amps service whereas the Shaws had requested 400 amps service and refused to provide more information about the property's proposed use to Glenda Hill when she asked for it in an effort to better understand the Shaws' application. Finally, there was substantial and uncontradicted evidence that the County's reasons for denying the application were not for purposes of delay and were not based on enmity for the Shaws or their land management practices.

The totality of this substantial evidence supports the legal conclusion, as the trial court made, that under *Landgate*, there was no compensable taking.

The Shaws contend on appeal that they were "prevented" from offering evidence of the County's "animus" toward their development efforts in order to show that the County had engaged in "delaying tactics" that would satisfy *Landgate*'s test. But *Landgate* made clear that "[t]he proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter. [Citations.] This type of objective inquiry is consistent with the principle that courts do not delve into the individual purposes of decisionmakers in a quasi-adjudicative proceeding, but rather look to the findings made by the government agency and determine whether these are based on substantial evidence. [Citations.]" (*Landgate, supra*, 17 Cal.4th at p. 1022.) That inquiry is satisfied here.[49]

The Shaws further contend that the undisclosed "internal 'policy memo' " and Glenda Hill's inability to promptly return phone calls and respond to inquiries, matters that were in evidence, together showed that the delays here were beyond normal developmental delays such that even under *Landgate*, they established a taking. But the trial court expressly found that the County's failure to turn over the policy memo did not effect a change in the parties' positions. And there was substantial evidence that the undisclosed policy memo was ultimately just one of three reasons for the electrical permit denial by Glenda Hill and not the reason that the planning director upheld the denial, evidence that further supports this factual finding. While the trial court certainly faulted the County's inefficiency and understaffing in its findings, it also determined that any resulting delay was not related to an "anti-development philosophy," i.e., delay for delay's sake or for the purpose of impeding the Shaws' development plans in what would qualify as an

[49] In addition, as we address below, the Shaws have failed to show any abuse of discretion in the court's evidentiary rulings.

exception to *Landgate*'s primary holding. The trial court also found that delays that were shown to be the result of these factors comprised only a fraction of the total period of delay, much of which was found by the trial court to be attributable to the Shaws' desire to conduct discovery in this litigation. These findings too are supported by the record and there was no evidence that any delays that can be attributed to the County actually interfered with the Shaws' ongoing use of the property for their successful native-plant restoration.

The essential test under *Landgate* is whether the government's assertion of authority, whether or not erroneous, advanced some legitimate purpose, which is measured not by inquiry into the subjective motive of the government agency but by "whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter." (*Landgate, supra*, 17 Cal.4th at p. 1022.) We conclude that this test is satisfied here and that the County's legal position, though later found to be erroneous, was nevertheless plausible and the result of a bona fide dispute, precluding the finding of a taking under *Landgate*.

### V. *The Judgment on Nuisance and Trespass Is Correct and Supported by Substantial Evidence*

Both parties agree that our review of the judgment against the Shaws on their claims for nuisance and trespass involves application of the substantial evidence rule. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925]; see *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427], superseded on other grounds by statute as stated in *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1439 [91 Cal.Rptr.2d 322].)

The Shaws' causes of action for nuisance and trespass both arise from the county's dumping of or maintaining street sweepings on a county road next to their property. They contend that this practice caused unwanted foreign

grasses or plant species to migrate onto the property. Both causes of action include an element of causation. (CACI Nos. 2021, 2000 [trespass and nuisance claims both include factual element that defendant's conduct was a substantial factor in causing the harm].) The trial court found with respect to these tort claims that there had been a "failure of proof" as to this element.[50] Based on our own review of the record, we agree that there is no evidence in the record of a direct and probable link between the county's dumping practice and the presence of the unwanted grasses on the property.

When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This is because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case. (*Oldenburg v. Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 742 [314 P.2d 33] [trier of fact is exclusive judge of the credibility of the evidence and can reject evidence as unworthy of credence]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 659–660 [134 P.2d 788] [trial court is entitled to reject in toto the testimony of a witness, even if that testimony is uncontradicted].) Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571 [150 P.2d 422]; *Caron v. Andrew* (1955) 133 Cal.App.2d 402, 409 [284 P.2d 544].) Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Roesch v. De Mota, supra*, 24 Cal.2d at p. 571.) The answer here is no on both counts.

In support of their challenge, the Shaws point only to their correspondence with the county in which they accused the county of causing unwanted plant species to invade their property. But these accusations are no substitute for proof of actual causation. And even if this evidence constituted proof of

---

[50] The court made the same finding with respect to the Shaws' negligence claim, which they appear to have abandoned on appeal, along with their other claims for injunctive relief, taxpayer relief, and declaratory relief as well as their claims for violation of their First Amendment rights. We so conclude because the Shaws do not address any of these claims in their briefing.

causation, there is contradictory evidence in the record. Thus, we cannot say that this correspondence compels a finding in the Shaws' favor on the nuisance and trespass claims.

Even if we credited this proffered evidence of causation with weight, the contradictory evidence came from Michael Shaw himself, who testified that there were undesirable grasses on the property when the Shaws acquired it; that there were numerous ways in which these unwanted species could migrate onto the property via water, wildlife, and people; that undesirable plantlife on the property will never be completely eradicated because it is part of the seed bank; and that he could not directly "[p]rove the effect of any of the weed seeds" that had been dumped by the county on the road adjacent to the property. This constitutes substantial evidence supporting the trial court's judgment on the Shaws' causes of action for nuisance and trespass. Thus, even under the ordinary substantial evidence rule, which binds us to give deference to a trial court's factual determinations (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378] [trial court's resolution of disputed factual issue must be affirmed so long as supported by substantial evidence]), our analysis is at an end and we are compelled to affirm the judgment on these claims.

VI. *The Shaws Have Shown No Abuse of Discretion in the Court's Evidentiary Rulings and They Have Waived Claims Asserted for the First Time on Appeal*

The Shaws contend, largely without pointing to specific instances in the record, that the trial court erred by refusing to admit evidence demonstrating a pattern of "unreasonable behavior" and "arbitrary actions" by the County. The evidence they refer to generally consists of two matters. The first is the County's 1988 denial of their minor land division application, which the Shaws did not challenge. The second concerns zoning overlays that the County only informally indicated to the Shaws might potentially affect other potential aspects of the property's future development but as to which no formal application has ever been submitted. These overlays are inclusion of the property within the coastal zone, scenic corridor and agricultural buffer designations, and other zoning designations that the Shaws contend in this litigation are inconsistent with the general plan.

Although the trial court did admit some evidence regarding these matters, it also excluded other such evidence for lack of relevance because these matters did not relate to the specific issue that was being tried—the County's

liability in inverse condemnation arising out of its denial of the Shaws' electrical permit application. Moreover, the trial court viewed evidence from the 1988 subdivision denial, other than the facts of the application and denial themselves, as too remote in time, i.e., "aged out." Furthermore, with regard to the zoning overlays, the trial court observed that the Shaws had not submitted a development application (other than the time-barred one in the mid-1980's) that had elicited a final regulatory decision based on the zoning overlays. In other words, the question of the County's reasonableness in applying these overlays to the property had not been tested by an actual application for development that involved them.

We review a trial court's evidentiary rulings for abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) This is particularly so with respect to rulings that turn on the relevance of the proffered evidence. (*Ibid.*) This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court "exceeds the bounds of reason, all of the circumstances before it being considered." (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 566.) There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].) A trial court will abuse its discretion by action that is arbitrary or " 'that transgresses the confines of the applicable principles of law.' " (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 [33 Cal.Rptr.3d 644]; see *In re Cortez* (1971) 6 Cal.3d 78, 85 [98 Cal.Rptr. 307, 490 P.2d 819].) In appeals challenging discretionary trial court rulings, it is the appellant's burden to establish an abuse of discretion. (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 331; *Denham v. Superior Court, supra*, 2 Cal.3d at p. 566.)

The Shaws have failed to carry that burden here. The biggest flaw in their argument is their failure to offer any analysis that articulates their evidentiary claims within the context of the applicable standard of review. They also argue that all of their proffered evidence of the unreasonableness of the County's actions should have been admitted because it related to the Shaws' due process violation claims. But the record is clear that these claims were not even before the court in the bifurcated trial. They also generally argue that this evidence was relevant to the takings question under *Landgate* in that it showed the County's bad motives in interfering with their development attempts. But they fail to recognize that an agency's subjective motives are not relevant under *Landgate*. (*Landgate, supra*, 17 Cal.4th at p. 1022.) They also fail to articulate any reason why the County's positions on matters *other* than the electrical permit application in question, especially matters as to

which the Shaws had not exhausted administrative remedies such as the zoning overlays, had any relevance whatsoever to the takings analysis under either *Lingle* or *Landgate*. While they argued below that time-barred evidence was admissible in a due process challenge to put the actionable claims in context, they cite no authority extending this principle to the takings context.

Moreover, the failure to make an adequate offer of proof in the court below ordinarily precludes consideration on appeal of an allegedly erroneous exclusion of evidence. (Evid. Code, § 354; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 344 [100 Cal.Rptr.2d 854]; *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1433 [77 Cal.Rptr.2d 574].) The Shaws fail to point to any place in the record where they successfully preserved their evidentiary claims of error in this manner. And they fail to demonstrate how any claim of error in the trial court's exclusion of evidence would have made any difference in the outcome. (Evid. Code, § 354.)

For all these reasons, the Shaws' generalized arguments about the trial court's exclusion of broad categories of evidence fail to demonstrate reversible error. They specifically address just two items of excluded evidence, which we now proceed to dispense with.

As far as we can tell, the Shaws specifically contend for the first time on appeal that Michelle Michael's handwritten notes from her interactions with the County concerning the Shaws' electrical permit application, which were excluded based on the hearsay rule, should have been admitted under an exception to that rule. They also specifically contend for the first time that a letter from the Shaws' representative to the County regarding the electrical permit, which was also excluded based on hearsay, should have been admitted under a different hearsay exception. In neither case was the asserted hearsay exception even alluded to in the court below.

Where, as here, a proponent of evidence does not assert a particular ground of admissibility below, he or she is precluded from arguing on appeal that the evidence was admissible under a particular theory. (Evid. Code, § 354; *People v. Fauber* (1992) 2 Cal.4th 792, 854 [9 Cal.Rptr.2d 24, 831 P.2d 249] [defendant precluded from complaining on appeal that statement was non-hearsay where trial counsel did not specifically raise that ground of admissibility]; *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33].) The Shaws made no attempt here to show that this evidence came within an exception to the hearsay rule, and they did not attempt, by offer of proof or otherwise, to lay a proper foundation for what they now claim are applicable exceptions to the hearsay rule. In order to preserve the claim for appeal, the proponent has to have alerted the trial court to the exception relied upon and borne the burden below of laying the proper

foundation. (*People v. Livaditis* (1992) 2 Cal.4th 759, 778–779 [9 Cal.Rptr.2d 72, 831 P.2d 297].) The Shaws did neither here and they have accordingly waived their claims of error as to the only two items of evidence that they specifically discuss.

## VII. *The Shaws Forfeited Their Civil Rights and Due Process Claims*

The Shaws contend that the trial court refused to entertain their due process claims, asserted as civil rights violations, by erroneously ruling in limine that these claims were not ripe. But the record shows that the court made no dispositive ruling on these claims during the course of the bifurcated trial, whether in limine or otherwise. Rather, the claims were later dismissed by the judgment, as part of its dismissal of the Shaws' entire complaint with prejudice. We conclude that the Shaws acquiesced in this dismissal of their due process claims by failing to pursue the claims after the bifurcated court trial on other issues had ended; by failing to object in some way to the form of the judgment dismissing the claims when given the opportunity; by failing to bring what they now claim to be error to the trial court's attention by request for statement of decision or posttrial motion; or by failing to seek relief from the dismissal in the trial court.

First, it is true that in discussing the County's motion in limine to bifurcate liability on the Shaws' inverse condemnation claim and to dismiss their federal takings claim as unripe, which motion was not directed in any event to the Shaws' due process violation claims, the trial court appeared to conflate the federal takings claim, which, as the Shaws conceded, was not ripe, with their due process claims. But, in colloquy, the court explicitly said that it was neither eliminating the Shaws' "right to proceed" with a jury trial of their federal takings or due process claims nor "dismiss[ing them] with prejudice." At the end of this discussion, the court gave its "*tentative* ruling" and "*tentative* intention" (italics added) to defer these claims ("It's almost like [abating] a cause of action . . . . It's not ripe.") and it granted the County's motion to bifurcate the question of its liability in inverse condemnation, leaving the due process and federal takings claims, along with the other remaining claims, for another day.[51] And later during trial, the court

---

[51] The court's parallel treatment of the federal takings and due process claims likely had its genesis in pre-*Lingle*, Ninth Circuit precedent, which had in essence eliminated due process challenges to deprivations of property. In contrast to some other circuits (see, e.g., *Pearson v. City of Grand Blanc* (6th Cir. 1992) 961 F.2d 1211), the Ninth Circuit had taken the position that a substantive due process challenge was subsumed in a related takings claim; as a claim rooted in the more general Fourteenth Amendment, it was preempted by the more specific constitutional provision of the Fifth Amendment. (See *Macri v. King County* (9th Cir. 1997) 126 F.3d 1125, 1129; *Armendariz v. Penman* (9th Cir. 1996) 75 F.3d 1311, 1324.) But this Ninth Circuit doctrine likely does not have further viability after *Lingle* because in that case, the United States Supreme Court held that challenges concerning the means-ends relationship

made statements confirming that it anticipated further proceedings, as did counsel for the Shaws. Although at the end of the bifurcated trial, the court said that it would be issuing a memorandum decision, nothing about that statement indicated that the court had reached a final ruling or disposition of the remaining claims that had yet to be disposed of, including the due process claims.

The Shaws contend that the court's memorandum decision reflects its disposition of their due process claims by its reference to its "rulings on various pretrial motions." But there, the court was simply referring to the fact that among its in limine rulings, it had granted the County's motion to bifurcate liability on the inverse condemnation claim and this had narrowed the issues that had been tried. The court followed its reference to its pretrial rulings by stating, "Specifically, the issues to be decided [during the course of the bifurcated trial] were whether the County was responsible on theories of trespass, nuisance, and/or negligence" and "whether there has been a compensable taking."

Thus, contrary to the Shaws' contention, the memorandum decision does not reflect a prior, dispositive ruling on the Shaws' due process claims, which were not even the target of the County's bifurcation motion. Indeed, the memorandum decision could not reflect a prior, dispositive ruling on the due process claims because the record clearly shows that the court had not made such a ruling. The court's earlier comments about the due process claims not being "ripe," whether legally erroneous or not, did not amount to a formal, final, or dispositive ruling on these claims. There had been no motion directed to these claims and whatever the court said, it clearly indicated that it was *not* dismissing these claims with prejudice or depriving the Shaws of their right to a jury trial on them. Even the court's instruction in its memorandum decision to the County to prepare a judgment did not mean that the court had made a dispositive ruling on the claims remaining to be resolved, including the due process claims. There was no reason that an interlocutory judgment on the tried claims could not have been entered at that point with a later disposition on the remaining claims, which included the due process and other claims.

---

of a statute do not implicate the takings clause, leaving these challenges distinctly in the separate due process realm. (*Lingle, supra,* 544 U.S. at pp. 540–542.) Hence, after *Lingle,* even in the Ninth Circuit, property deprivation claims based on arbitrary or unreasonable conduct may proceed independently from a takings claim in a due process challenge. (*Action Apartment, supra,* 509 F.3d 1020, 1024–1026; *Crown Point, supra,* 506 F.3d at pp. 855–856; *North Pacifica, supra,* 526 F.3d at pp. 484–485; *Shanks v. Dressel* (9th Cir. 2008) 540 F.3d 1082, 1086–1087.) Because of our conclusion that the Shaws forfeited their due process claims, we need not decide whether the trial court's tentative view that these claims were not ripe was correct or not.

The grounds on which an action, or part of an action, may be dismissed are generally prescribed by statute. Section 581 describes the various circumstances under which an action, or part of an action, may or must be dismissed. Subdivision (d) provides in relevant part that "the court shall dismiss the complaint, or any cause of action asserted in it, in its entirety or as to any defendant, with prejudice, when upon the trial and before the final submission of the case, the plaintiff abandons it." Here, the judgment dismissed all causes of action of the complaint, four of which had been decided against the Shaws as part of the bifurcated court trial, and the balance apparently because the Shaws had abandoned them by failing to pursue them. The dismissal of the due process claims thus fits squarely within section 581, subdivision (d).

The Shaws attempt to impeach the judgment on the due process claims with the trial court's oral comments concerning their ripeness and its memorandum decision. But as we have already explained, where a party has failed to request a statement of decision, neither a trial court's oral comments nor a memorandum decision may be used in this manner. (*Ditto, supra*, 206 Cal.App.3d at pp. 646–648.)

The Shaws had the opportunity after the conclusion of the bifurcated portion of the trial to request a jury trial on their remaining claims, of which the due process claims were only a part, which may or may not have elicited a dispositive ruling that the claims were not ripe for adjudication. But they failed to do so. They also had the opportunity to request a statement of decision in order to flesh out what they perceived to be the court's in limine rulings at trial, but, again, they declined to do so. Such a request here would have ultimately elicited either a dispositive conclusion of law that the claims were not ripe or, alternatively, a jury trial on the claims. The Shaws also had the opportunity to object to the form of the proposed judgment dismissing the entire complaint with prejudice. Even though the procedure used here governed orders on law and motion and not judgments, the Shaws were still provided with the chance to object to the dismissal of their due process claims and yet they did not. They also could have brought what they now claim to be error to the trial court's attention via a posttrial motion, but they declined to do this as well. And they could have sought relief from the dismissal below if they truly had not intended to abandon their due process claims, whether to pursue this appeal on the tried claims or otherwise. But they chose not to exercise this option either.

"The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation.]' [Citations.] Strong policy reasons support this rule: 'It is both unfair and

inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] ' " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " [Citation.]' [Citation.]" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [6 Cal.Rptr.3d 723, 79 P.3d 1030].)

Forfeiture, otherwise known as waiver,[52] may result from action or inaction, though falling short of express waiver that demonstrates acquiescence in the error. (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 742–743 [31 Cal.Rptr.2d 659]; *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856–857 [176 Cal.Rptr. 239]; see also *Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1167 [112 Cal.Rptr.2d 540] ["Under the doctrine of waiver, a party loses the right to appeal an issue caused by affirmative conduct or by failing to take the proper steps at trial to avoid or correct the error. [Citation.]"].)

On the record presented here, we conclude that the Shaws acquiesced below in the dismissal with prejudice of their due process violation claims. We therefore conclude that they have forfeited their appellate rights with respect to these claims and we decline to address their related claims of error.

VIII. *Summary of Conclusions*

In summary, our review leads us to conclude that (1) substantial evidence supports the trial court's judgment that there was no compensable taking under *Lingle* or *Landgate*; (2) the court's judgment on the nuisance and trespass claims was correct and is supported by substantial evidence; (3) there has been no showing that the trial court abused its discretion in its evidentiary rulings; and (4) the Shaws have forfeited appellate review of their due process violation claims.

---

[52] While "waiver" is the term commonly used to describe a party's loss of the right to assert an appellate challenge based upon the failure to raise an objection below, "forfeiture" is the more technically accurate term. As our Supreme Court has explained: "Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim. In contrast, a waiver is the ' "intentional relinquishment or abandonment of a known right." ' [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [13 Cal.Rptr.3d 786, 90 P.3d 746], superseded on other grounds by statute as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962 [84 Cal.Rptr.3d 557].)

## DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.